SOUTH LAKE FARMS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

SOUTH LAKE FARMS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 82944, 82945. Filed September 15, 1961.

*H. D. Costigan, Esq.,* and *Gordon M. Weber, Esq.,* for the petitioners.

*John O. Hargrove, Esq.,* for the respondent.

WITHEY, *Judge:* The respondent has determined deficiencies in the income tax of petitioner South Lake Farms, Inc., of $35,029.52, $37,791.98, and $853,731.09 for the fiscal years ended April 30, 1955, and April 30, 1956, and the period beginning May 1 and ending October 3, 1956, respectively. The respondent has determined that petitioner South Lake Farms is liable as transferee of the assets of South Lake Farms, Inc., for the foregoing deficiencies in the income tax of the latter corporation.

The issues for determination in the case of South Lake Farms, Inc., are the correctness of the respondent's action (1) in determining that the taxable income of the petitioner for the period May 1 through October 3, 1956, should be increased by the amount of $1,808,-679.94 as representing the value of petitioner's growing crops at the time of petitioner's distribution in complete liquidation of all of its assets to its parent corporation, South Lake Farms, (2) in determining, in the alternative, in the event the preceding issue is decided adversely to him, that the taxable income of the petitioner for the period May 1 through October 3, 1956, should be increased by the amount of $847,632.58 as representing the expenses determined by respondent to have been incurred by petitioner in connection with its growing crops to the time of its liquidation, (3) in determining that the petitioner did not sustain a net operating loss of $150,618.26 for the period May 1 through October 3, 1956, and accordingly did not have a net operating loss carryback of $77,941.38 to the fiscal year ended April 30, 1955, and a net operating loss carryback of $72,676.88 to the fiscal year ended April 30, 1956.

In addition to the foregoing issues presented in the case of South Lake Farms, Inc., the case of South Lake Farms also presents as an issue the correctness of the respondent's action in determining that South Lake Farms is liable as transferee of the assets of South Lake Farms, Inc., for the deficiencies in income tax of the latter corporation involved herein.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are found accordingly.

South Lake Farms, Inc., sometimes hereinafter referred to as the old corporation, was organized under the laws of California in May 1946, has its principal office at Fresno, California, and filed its Federal income tax returns for the fiscal years ended April 30, 1955, and April 30, 1956, and the period May 1 through October 3, 1956, with the district director in San Francisco, California.

South Lake Farms, sometimes hereinafter referred to as the purchasing corporation, is a California corporation with its principal office at Fresno, California. Its Federal income tax returns for the periods here involved were filed with the district director in San Francisco, California. The purchasing corporation originally was organized under the name of Ross Mercantile Company in May 1954 to conduct a general merchandising business. On January 3, 1956, its charter was suspended for failure to pay its annual license fee. The charter was revived on September 26, 1956, and the name of the corporation was changed to South Valley Farms. Thereafter, on October 8, 1956, the corporation's name was further changed to its present name, South Lake Farms.

From the time of its organization in May 1946 until October 3, 1956, the old corporation was engaged in the farming business in Tulare, Kings, and Kern Counties, California. Its principal products were cotton, barley, cover crops, and cattle and sheep and their by-products. During the summer of 1956 its farming activities were conducted on approximately 33,424 acres of land owned by it and 43,470 acres of additional land leased by it.

At all times material herein the old corporation regularly kept its books and filed its income tax returns on the basis of an accrual method of accounting and on the basis of a fiscal year beginning on May 1 and ending on April 30, except for its final fiscal period which began May 1 and ended October 3, 1956. Crops unharvested at the end of each fiscal year were not inventoried or otherwise included in gross income until the following year when they were harvested. Crops harvested and on hand at the end of each fiscal year were included in inventories at the lower of estimated cost or actual market value.

On September 29, 1956, and for about a year prior thereto the stock of the old corporation was owned by approximately 30 individuals, most of whom were members of the Hill family.

On or about September 7, 1956, Carl Quandt and Kenneth Quandt made an offer to the owners of all of the capital stock of the old corporation and to two affiliated partnerships for the purchase by them, or by a corporation to which their rights might be assigned, of all of the capital stock of the old corporation and all of the interests in two partnerships for $5 million. The offer was conditioned upon the accomplishment of transactions necessary to the dissolution of the old corporation on or before October 5, 1956, in order that its assets could be transferred to a successor corporation by that date. The offer was accepted by all of the parties to whom it was addressed, including all of the shareholders of the old corporation, on or about September 19, 1956. On September 28, 1956, amendments not material herein were added to the contract of purchase and sale.

Both the offerors and the offerees expected that the harvest of the old corporation's 1956 cotton crop would commence on or shortly after October 5, 1956. The estimated value of the old corporation's unharvested crops was taken into account by the parties in fixing the purchase price of the old corporation's stock. The possibility of substantial refunds of Federal income tax to the old corporation as the result of an anticipated net operating loss sustained by the old corporation during its last or final taxable period also was taken into account by the parties in fixing the purchase price of the stock of the old corporation.

On September 26, 1956, the charter of the purchasing corporation, which had been suspended since January 3, 1956, because of failure to pay its annual license fee, was revived at the request, by telegram, of Producers Cotton Oil Company, Carl Quandt, Kenneth Quandt, and David S. Davis. On the same day, September 26, 1956, the foregoing persons purchased the capital stock of the purchasing corporation in the following indicated percentages:

| Stockholder | Percentage |
|---|---|
| Producers Cotton Oil Company | 40 |
| Carl Quandt | 20 |
| Kenneth Quandt | 20 |
| David S. Davis | 20 |

Immediately following the foregoing purchases A. T. Mann, an officer of Producers Cotton Oil Company, the Quandts, and Davis became directors of the purchasing corporation. On October 2, 1956, the Quandts executed a stock-voting proxy to the Producers Cotton Oil Company and thereafter, at all times material herein, that company controlled the purchasing corporation.

The principal business activity of Producers Cotton Oil Company is, and at all times material herein has been, the ginning of cotton, including cotton purchased, ginned, and sold by it, the purchase of cottonseed, and the manufacture and sale of cottonseed products. During 1956 Producers Cotton Oil Company held the controlling stock of Calflax Company and Sunset Farms, Inc., two corporations engaged in the business of farming, including the growing of cotton for sale to Producers for its ginning and manufacturing operations.

On or about September 27, 1956, the directors of the purchasing corporation authorized the acquisition by the corporation of the rights and the assumption by it of the obligations of the Quandts under the contract of September 7, 1956, as subsequently amended. Such contract was then assigned to the purchasing corporation which on September 29, 1956, purchased all the outstanding shares of the old corporation's stock.

The purpose of the purchasing corporation in purchasing the capital stock of the old corporation was to dissolve it immediately and take over its assets.

In order to finance the initial payment of $1 million for the stock of the old corporation and for working capital needs, the purchasing corporation obtained a bank loan of $1,750,000 on the security of a crop mortgage and the guarantee of repayment by Producers Cotton Oil Company.

Subsequently and on October 2, 1956, a plan of dissolution and complete liquidation of the old corporation was adopted by its then sole shareholder, the purchasing corporation, at a meeting of the shareholders of the old corporation held on that date. The plan, which was never modified or rescinded, was as follows:

*PLAN OF DISSOLUTION AND COMPLETE LIQUIDATION*
*OF*
*SOUTH LAKE FARMS, INC.*

Dated: October 2nd, 1956

SOUTH LAKE FARMS, INC. (hereinafter called the Subsidiary) is a corporation organized and existing under and by virtue of the laws of the State of California and has outstanding a total of 2,250 shares of stock, all of which shares are common stock.

SOUTH-VALLEY FARMS (hereinafter called the Parent) is a corporation organized and existing under and by virtue of the laws of the State of California and is the owner beneficially and of record of all of said issued and outstanding shares of the Subsidiary.

The separate existence of the Subsidiary is no longer necessary or advisable, and it is to the best interests of the Subsidiary and the Parent that the Subsidiary be wound up, dissolved and completely liquidated, and that the Parent, as the sole shareholder of the Subsidiary, receive all of the property, assets and franchises of the Subsidiary, to be distributed to the Parent in complete liquidation of the Subsidiary and in complete cancellation and redemption of all of the stock of the Subsidiary, in the manner hereinafter in this Plan provided.

In order to effect these purposes the following steps shall be taken:

(1) The Parent, as sole shareholder of the Subsidiary, will cause a special meeting of the shareholders of the Subsidiary to be held on written waiver of notice and consent to the holding of the meeting signed by the Parent.

(2) At said special meeting of the shareholders of the Subsidiary, the Parent, as sole shareholder of the Subsidiary, will cause all of the issued and outstanding shares of the Subsidiary to be voted in favor of resolutions (a) electing to wind up and voluntarily dissolve the Subsidiary, (b) adopting this Plan and authorizing, approving, ratifying and confirming this Plan in all respects, and (c) authorizing the complete liquidation of the Subsidiary and the distribution of all of its property, assets and franchises to the Parent, as sole shareholder of the Subsidiary, subject to the debts and liabilities of the Subsidiary, in complete cancellation and redemption of all of the stock of the Subsidiary.

(3) A special meeting or meetings of the Board of Directors of the Subsidiary will be held and, at said meeting or meetings, there will be adopted resolutions (a) authorizing compliance with Section 4605 of the Corporations Code of the State of California and (b) determining that all known debts and liabilities

of the Subsidiary have been fully paid or adequately provided for within the meaning of Section 5000 of the Corporations Code of the State of California.

(4) The Subsidiary will take all necessary further steps to cause its complete liquidation and the distribution of all of its property, assets and franchises to the Parent, as sole shareholder of the Subsidiary, subject to the debts and liabilities of the Subsidiary, in complete cancellation and redemption of all of the stock of the Subsidiary, and the Parent will take all necessary further steps to the same end and to assume all debts and liabilities of the Subsidiary.

(5) The Subsidiary will take all necessary further steps to accomplish its winding up and voluntary dissolution in the manner provided by Section 4600 et seq. of the Corporations Code of the State of California.

(6) Upon the distribution of assets all outstanding shares of the Subsidiary will be automatically cancelled and extinguished and all certificates representing outstanding shares of the Subsidiary shall be surrendered to it for cancellation and shall be cancelled; provided, however, that the surrender and cancellation of such certificates shall not be a condition precedent to the automatic cancellation and extinguishment of the shares of the Subsidiary represented thereby.

(7) This Plan shall be completed as soon as possible and in any event on or before December 31, 1956.

Thereafter and on October 2 and 3, 1956, all steps necessary under California law were taken for the dissolution and liquidation of the old corporation and the distribution of all its assets to the purchasing corporation. On October 3, 1956, and pursuant to the plan of dissolution and complete liquidation all of the assets of the old corporation were distributed and transferred to the purchasing corporation without any payment to the old corporation by the purchasing corporation. Immediately after the foregoing transfer of its assets to the purchasing corporation the old corporation had no assets.

The assets so distributed to the purchasing corporation by the old corporation consisted, among others, of the latter's land, leaseholds, the unharvested 1956 cotton crop of the old corporation, and the preparation it had made of land for later planting in 1956 of a barley crop for harvesting in 1957, sometimes hereinafter referred to as the land preparation.

The cotton crop was on approximately 5,100 acres of land, approximately 3,925 acres of which the old corporation had leased. All of the crop had been planted on or before April 30, 1956, and expenses in the amount of $497,641.93 had been incurred in connection with its planting and growth. Of the $497,641.93, the amount of $254,566.91, which included depreciation in the amount of $22,721.24, represented expenses incurred during the period May 1 through October 3, 1956, and was included in the deductions taken by the old corporation in its Federal income tax return for that period in accordance with its accrual method of accounting. The remainder of the expenses, $243,075.02, which included depreciation in the amount of $9,087.86, was incurred during the old corporation's fiscal year ended April 30, 1956, and was included in the deductions taken in the old corporation's

Federal income tax return for that year in accordance with that corporation's accrual method of accounting.

The cotton crop which produced 11,010 bales, or an average yield per acre of 2.16 bales, was harvested by the purchasing corporation at a total cost of $271,505.56 during the fall of 1956 as follows:

| 1956 | Bales | 1956 | Bales |
|---|---|---|---|
| Oct. 4–14 | 790 | Nov. 26–Dec. 2 | 314 |
| Oct. 15–21 | 1,504 | Dec. 3–9 | 455 |
| Oct. 22–28 | 2,877 | Dec. 10–16 | 313 |
| Oct. 29–Nov. 4 | 1,707 | Dec. 17 | 120 |
| Nov. 5–11 | 1,642 | | |
| Nov. 12–18 | 986 | Total | 11,010 |
| Nov. 19–25 | 302 | | |

The cotton was ginned by Producers Cotton Oil Company and sold by the purchasing corporation for gross proceeds of $1,855,518.68. Of the foregoing amount $1,670,887.04 was received from Producers for cotton and cottonseed sold to it and $184,631.64 was received for cotton sold to others.

Following the distribution of the assets of the old corporation to it, the purchasing corporation under the provisions of section 334(b)(2) of the Internal Revenue Code of 1954 allocated its adjusted basis of the stock of the old corporation to the various assets. The portion of the adjusted basis of the stock allocated to the cotton crop was $1,616,667.73. In making the foregoing allocations the purchasing corporation made estimates of the fair market values as of the date of liquidation of the old corporation of the assets of that corporation and in doing so estimated the fair market value of the cotton crop at that date, which was prior to the incurring of harvesting costs, to be $1,593,619.44.

In determining its gross and taxable income for its fiscal year July 1, 1956, through June 30, 1957, the purchasing corporation included in its gross receipts the proceeds from the sale of the cotton and cottonseed, $1,855,518.68, and against its gross receipts offset the costs of harvesting the cotton, $271,505.56, and the portion of its adjusted basis of the stock of the old corporation which it had allocated to the cotton crop, $1,616,667.73.

Included in the land and the leaseholds distributed and transferred by the old corporation to the purchasing corporation were approximately 13,000 acres of land of which approximately 1,000 acres were leased, which the old corporation had prepared for the planting of a 1956–1957 barley crop. The barley crop was planted by the purchasing corporation at an undisclosed cost between November 5 and December 15, 1956. Expenses incurred by the old corporation for the land preparation totaled $215,060.50. Of the foregoing amount, $170,223.91 was incurred during the period from May 1 through October 3, 1956, and was included in the deductions taken in the Federal

income tax return of the old corporation for that period in accordance with its accrual method of accounting. The remainder, $44,836.59, was incurred during the fiscal year ended April 30, 1956, of the old corporation and was included in the deductions taken by the old corporation in its Federal income tax return for that year in accordance with its accrual method of accounting.

The portion of its adjusted basis of the stock of the old corporation allocated by the purchasing corporation to the land preparation was $218,156.73. The purchasing corporation estimated the fair market value of such preparation at the time of the liquidation of the old corporation to be $215,060.50, the total amount incurred by the old corporation for such preparation.

The barley crop was harvested at an undisclosed cost by the purchasing corporation during the period May 26, 1957, through July 10, 1957, and sold by that corporation for an undisclosed amount. In determining its gross and taxable income the purchasing corporation included in its gross receipts the proceeds from the sale of the barley and against its gross receipts offset its costs of planting, growing, and harvesting the barley and the portion of its adjusted basis of the stock of the old corporation which it had allocated to the land preparation, $218,156.73.

In its Federal income tax return for the fiscal year beginning July 1, 1956, and ending June 30, 1957, the purchasing corporation reported a net loss of $1,440,363.08 from its operations during that year.

In its Federal income tax return for the period May 1 through October 3, 1956, the old corporation reported a net operating loss of $150,618.26. After filing its return for the foregoing period the old corporation filed with respondent an application for a carryback of the loss to its fiscal years ended April 30, 1955, and April 30, 1956, in the amounts of $77,941.38 and $72,676.88, respectively, which the respondent allowed.

In determining the deficiency in the old corporation's income tax for the period May 1 through October 3, 1956, the respondent determined that the corporation's taxable income should be increased by $1,808,679.94, accordingly included that amount in the corporation's income, offset against that amount a net loss of $150,618.26 reported in the corporation's return, and determined $1,658,061.68 as the amount of the corporation's taxable net income for the period. In the notice of deficiency the respondent explained his action as follows:

Growing crops [cotton crop and land preparation] valued at $1,808.679.94 were distributed by South Lake Farms, Inc. when the corporation was liquidated on or about October 3, 1956. Costs and expenses allocable to those growing crops were deducted by South Lake Farms, Inc. in computing its taxable income for the period May 1, to October 3, 1956. The value of those crops at the date of distribution was not included in the taxable income for the taxable period men-

tioned, nor were the proceeds ultimately received upon sale of the crops when harvested.

It is held that the method of accounting employed in computing the taxable income of South Lake Farms, Inc. for the taxable period does not properly reflect income under the provisions of the Internal Revenue Code of 1954, including sections 268, 441, 446, and 482 thereof. Accordingly, taxable income has been increased $1,808,679.94, the value of the growing crops at the date of liquidation.

In the alternative, in the event it is finally determined that the value of the crops is not includible in the taxable income of South Lake Farms, Inc. for such taxable period, it is held that taxable income for such period is to be increased by the amount of $847,632.58, representing the determined expenses attributable to such crops and incurred as of the date of liquidation.

Having determined that the old corporation had no net operating loss for the period May 1 through October 3, 1956, the respondent disallowed the net loss carrybacks by the old corporation from that period to its fiscal years ended April 30, 1955, and April 30, 1956, which previously had been allowed and, accordingly, determined the deficiencies involved herein for those years.

## OPINION.

In view of the respondent's reference to section 441 of the Code in the explanation of his action as set out in the notice of deficiency, it is observed at this point there is no controversy between the parties respecting the period May 1 through October 3, 1956, constituting a proper taxable period for the old corporation within the contemplation of that section.

The primary issue for determination is the correctness of the respondent's action in increasing the taxable income of the old corporation for the period May 1 through October 3, 1956, by $1,808,679.94 as representing the value of the cotton crop in the amount of $1,593,619.44 and the value of the land preparation in the amount of $215,060.50 on October 3, 1956, the date of the liquidation of the old corporation.

In support of his action respondent contends that the old corporation, in accordance with its accrual method of accounting, took deductions of $712,702.43 for expenses incurred in connection with producing the cotton crop and making the land preparation for planting a barley crop, that since these were distributed in liquidation to the purchasing corporation before the crops were harvested, the old corporation was in the position of being able to take the deductions arising from its crop-growing business without reporting the income resulting from the operation and thereby reported a large operating loss of its last taxable period, May 1 through October 3, 1956. The respondent also contends that irrespective of whether the accrual method employed by the old corporation was proper for its earlier taxable periods when it sold the crops it produced, the method did not clearly reflect

its taxable income for its last taxable period and that he properly invoked and correctly applied the provisions of section 446(b) of the 1954 Code.[1] As further support for his action the respondent relies on *Lucas* v. *Earl*, 281 U.S. 111 (1930), affirming 10 B.T.A. 723 (1928); *Helvering* v. *Horst*, 311 U.S. 112 (1940), affirming 39 B.T.A. 757 (1939); and *Helvering* v. *Eubank*, 311 U.S. 122 (1940), affirming 39 B.T.A. 583 (1939), and other cases stemming from the foregoing cases.

The petitioners take the position that section 446(b) and the cases relied on by the respondent are inapplicable here and that the inclusion by the respondent of the value of the cotton crop and land preparation as determined by him is not only unwarranted under section 446(b) but is an attempt by respondent to disregard the provisions of section 336 of the Code,[2] which prohibit the recognition of any gain or loss to the old corporation on the distribution of its property to the purchasing corporation in complete liquidation.

Section 446(a) and (c) of the Code provides that the taxable income of a taxpayer shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books and recognizes an accrual method as being a permissible method. Section 446(b) provides that if the method used by the taxpayer does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income. Section 336 provides that except as to installment obligations, none of which are involved herein, no gain or loss shall be recognized to a corporation on the distribution of property in partial or complete liquidation.

The respondent and the petitioners are in agreement that the old corporation was not required to include in its inventory, either on May 1, 1956, or October 3, 1956, any amount as the value of the cotton crop or the land preparation in computing its taxable income for its last taxable period which ended October 3, 1956, and respondent contends that his action is not to be equated as the inclusion of those items in the old corporation's inventory as of the close of October 3, 1956. In disclaiming any attempt to disregard the provisions of section 336 the

---

[1] SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING.

(a) GENERAL RULE.—Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

(b) EXCEPTIONS.—If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income.

(c) PERMISSIBLE METHODS.—Subject to the provisions of subsections (a) and (b), a taxpayer may compute taxable income under any of the following methods of accounting—
\* \* \* \* \* \* \*
(2) an accrual method:

[2] SEC. 336. GENERAL RULE.

Except as provided in section 453(d) (relating to disposition of installment obligations), no gain or loss shall be recognized to a corporation on the distribution of property in partial or complete liquidation.

respondent states on brief that he has not determined and is not here contending that the old corporation realized any gain upon the distribution of its property to the purchasing corporation, that any gain was scarcely possible since the purchasing corporation paid the old corporation nothing for its property, and urges that consideration of the applicability of section 336 to the distribution by the old corporation to the purchasing corporation is not essential to a determination of the correctness of his exercise of his powers under section 446.

The respondent admits, as the petitioners contend, that the factual situations involved in the cases relied on by him are substantially different from those in the instant situation. However, he urges that the rule of those cases is applicable here.

In *Lucas* v. *Earl*, *supra*, it was held that despite an agreement between a husband and wife that any property acquired by either should be held by them as joint tenants, the husband was subject to income tax on the entire amount of salary and legal fees earned by him. The holding in *Helvering* v. *Horst*, *supra*, was that the gift during the donor's taxable year of interest coupons detached from bonds owned by him, delivered to the donee, and later in the year paid at maturity constituted the realization of income taxable to the donor. In *Helvering* v. *Eubank*, *supra*, a general life insurance agent after termination of his agency contracts for services as agent made assignments of renewal commissions to become payable subsequently, without other apparent purpose than to confer on assignees the power to collect commissions, which they did during the taxable year involved. It was there held that the commissions were taxable as income of the assignor for the year in which paid. *Pearce* v. *Commissioner*, 315 U.S. 543 (1942), affirming 42 B.T.A. 91 (1940), involved an annuity contract purchased by the divorced husband for the divorced wife pursuant to their agreement made prior to the divorce. The question presented was whether the income arising from the annuity subsequent to the divorce decree was taxable to the wife who received it or to the husband who provided it. In holding that the income was taxable to the wife, the Supreme Court said:

Such cases as *Helvering* v. *Horst*, 311 U.S. 112, *Helvering* v. *Eubank*, 311 U.S. 122, and *Harrison* v. *Schaffner*, *supra*, are not opposed to this result. Those cases dealt with situations where the taxpayer had made assignments of income from property. He was held taxable on the income assigned by reason of the principle "that the power to dispose of income is the equivalent of ownership of it and that the exercise of the power to procure its payment to another, whether to pay a debt or to make a gift, is within the reach" of the federal income tax law. *Harrison* v. *Schaffner*, *supra*, p. 580. But in those cases the donor or grantor had "parted with no substantial interest in property other than the specified payments of income." *Id.* p. 583. Here he has parted with the corpus. And "the tax is upon income as to which, in the general application of the revenue acts, the tax liability attaches to ownership." *Blair* v. *Commissioner*, 300 U.S. 5, 12. * * *

To the time of the dissolution of the old corporation, no income had been received by or accrued to it with respect to the cotton crop or the land preparation. Although through expenditures incurred by it the old corporation owned a valuable unharvested cotton crop and owned and held under lease land which was more valuable because it had been prepared for the planting of a barley crop, neither of these items represented taxable income to the old corporation either earned, realized, received, or accrued. At most, they merely represented property being held by the old corporation for future disposition or utilization. Despite the foregoing and although the respondent does not contend that the old corporation realized any income on its distribution in complete liquidation of the cotton crop and land preparation to the purchasing corporation and although the purchasing corporation upon distribution became not only the owner of those items but also of the land and the leases on land with which those items were involved, the respondent asks us to sustain his action in including the value of the cotton crop and the land preparation at the time of their distribution in the income of the old corporation.

In *Elsie SoRelle*, 22 T.C. 459 (1954), a father who had four children discussed with his accountant in May 1946 the matter of gifts of land which he contemplated making to each of his children. By the fall of 1946 he had decided upon the parcels of land which he would give to the respective children and, upon advice from his accountant that a conveyance of the parcels would carry with them a transfer of any wheat growing thereon, proceeded to plant wheat on each parcel. In December 1946 the father told each child of the specific parcel which he intended to give it, that he had planted the parcel in wheat, and that the wheat crop also would be its (the child's). Thereafter, and following a warning from his accountant that unless he completed the gifts prior to the harvesting of the wheat he would be subject to income tax thereon, the father, on June 23, 1947, just prior to the harvesting (which terminated on July 4 or 5 of that year), executed warranty deeds conveying the four parcels of land upon which there were matured wheat crops to his four children. The fair market value of the matured wheat crops on the four parcels was $53,259.50. There were no restrictions or conditions placed by the father on the children's ownership of the land, the wheat, or the proceeds to be received from the sale of the wheat, but there was an understanding that the children would lend him the proceeds of sale. Two of the children attended to the harvesting of the wheat on their parcels. The father supervised the harvesting of the wheat on the parcels of the other two children which was done with machinery and employees of the father. At the time the gifts were made no arrangement had been made for the sale of the wheat and no immediate sale was contemplated. The wheat harvested from the four parcels was

placed in the father's storage bins where it was held without charge to the children until the father deemed it advantageous to sell, and was then sold by the father with the children's consent sometime after the end of 1947. The proceeds of the sale (less an amount retained by the father for harvesting and selling expenses) were subsequently loaned by the children to their father. The four children paid income tax on the profit realized from the sale of the wheat. The father, whose basis for reporting income was an accrual basis, deducted in his income tax returns for 1946 and 1947 the cost to him of planting, raising, and harvesting the wheat. The respondent there contended that the father realized and was taxable on income in 1947 equal to the fair market value of the wheat crop on the four parcels of land on the date of the gifts. Upon concluding that the conveyance of the parcels of land effected a conveyance of the wheat crop thereon and relying on the above-quoted portion of the opinion in *Pearce* v. *Commissioner, supra,* we held that the wheat became the property of the four children to whom the land was given and that "when the wheat was harvested and later sold the income resulting therefrom belonged to the children and was taxable to them and not to petitioner [father]."

In the instant case, the ownership of the land and the leaseholds on the land on which the unharvested cotton crop stood and on which the land preparation had been made was transferred by the old corporation to the purchasing corporation when the former distributed its property in complete liquidation to the latter and by the same distribution the ownership of the cotton crop and the land preparation likewise was transferred. Since in the *SoRelle* case the transfer of the ownership of the land and a mature but unharvested wheat crop thereon was held to prevent the inclusion in the income of the father of the fair market value of the wheat crop at the time of the transfer, we think for a like reason the value of the cotton crop and the land preparation here involved is not properly includible in the taxable income of the old corporation.

In reaching the foregoing conclusion we are aware that in the *SoRelle* case the respondent sought to include the value of the wheat at the date of gifts in the income of the father on the ground that under the rule of *Helvering* v. *Horst, supra,* the father had realized taxable income equal to such fair market value whereas here the respondent seeks under section 446 to include the value of the cotton crop and land preparation in the gross income of the old corporation on the ground that such inclusion is necessary in order to properly reflect the income of the old corporation because it deducted in its income tax returns the amounts of expenditures it had incurred in connection with the land preparation and in connection with the planting and raising of the cotton crop. In the *SoRelle* case the father, whose basis

for reporting income was an accrual basis, deducted in his income tax return the cost of planting and raising the wheat crop there involved but that fact did not preclude the holding that the income resulting from the sale of the wheat belonged to the children and was taxable to them and not to the father. The petitioners are sustained as to this issue.

Since we have not sustained the respondent on the foregoing issue, it becomes necessary to consider his alternative determination, namely, that the taxable income of the old corporation for the period May 1 through October 3, 1956, is to be increased by the amount of $847,632.58, representing the expenses determined by respondent as attributable to the cotton crop and land preparation and incurred as of the date of the old corporation's liquidation.

The notice of deficiency does not show how the respondent computed the foregoing amount of $847,632.58 nor does the record otherwise show how the amount was arrived at. However, the parties have stipulated in detail as to the expenses incurred by the old corporation with respect to the cotton crop and the land preparation and we have made findings accordingly. The total of such expenses as shown by the stipulation of the parties is $712,702.43 and the respondent on brief accepts that amount as the amount in controversy in this issue.

The respondent takes the position that in making his alternative determination—

that taxable income [of the old corporation] for such period [May 1 through October 3, 1956] is to be increased by the amount of $847,632.58 [$712,702.43], representing the determined expenses attributable to such crops [cotton crop and land preparation] and incurred as of the date of liquidation [Oct. 3, 1956]—

he exercised his discretion under section 482 of the Code [3] by allocating the deductions taken by the old corporation for such expenses to the purchasing corporation in the form of basis. The petitioners point out that there is nothing in the notice of deficiency to indicate any allocation of any deduction to the purchasing corporation and that the stipulation of facts filed by the parties shows that the respondent has done nothing other than follow section 334(b)(2) of the Code [4]

---

[3] SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

[4] SEC. 334. BASIS OF PROPERTY RECEIVED IN LIQUIDATIONS.

(b) LIQUIDATION OF SUBSIDIARY.—

* * * * * * *

(2) EXCEPTION.—If property is received by a corporation in a distribution in com-

prescribing the basis of the cotton crop and land preparation in the hands of the new corporation.

Section 482 provides that in the case of any two or more organizations, trades, or businesses, whether or not incorporated and whether or not affiliated, owned, or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

Section 334(b)(2) provides that if property is received by a corporation in a distribution in complete liquidation of another in a factual situation of the kind presented here, then the basis of the property in the hands of the distributee shall be the adjusted basis of the stock with respect to which the distribution was made.

Respecting allocation, the stipulation of facts filed herein by the parties contains the following:

The Commissioner's action with respect to allocation of gross income from any other taxpayer to the Old Company and with respect to allowance or disallowance to any taxpayer of the deduction for crop expenses here involved, in the alleged amount of $847,632.58, is contained in the deficiency notices attached as Exhibits A to the petitions in the above entitled cases, and also in the Commissioner's action in accepting the Purchasing Corporation's allocation of basis to the cotton and barley crops here involved.

As stipulated by the parties and set out in our findings, the purchasing corporation, following the distribution to it of the assets of the old corporation and acting under section 334(b)(2), allocated its adjusted basis of the stock of the old corporation to the various assets and of its adjusted basis of the stock allocated $1,616,667.73 to the cotton crop and $218,156.73 to the land preparation. According to the above-quoted portion of the stipulation the respondent has accepted the foregoing amount as representing the correct basis of such items in the hands of the purchasing corporation as provided by section 334(b)(2). Such being the situation it would appear that if

plete liquidation of another corporation (within the meaning of section 332(b)), and if—

   (A) the distribution is pursuant to a plan of liquidation adopted—

      (i) on or after June 22, 1954, and

      (ii) not more than 2 years after the date of the transaction described in subparagraph (B) (or, in the case of a series of transactions, the date of the last such transaction) ; and

   (B) stock of the distributing corporation possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote, and at least 80 percent of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends), was acquired by the distributee by purchase (as defined in paragraph (3)) during a period of not more than 12 months,

then the basis of the property in the hands of the distributee shall be the adjusted basis of the stock with respect to which the distribution was made. * * *

the expenses in the amount of $712,702.43 incurred by the old corporation with respect to such items had been allocated by the respondent to the purchasing corporation, either the basis of the cotton crop and that of the land preparation in the amounts of $1,616,667.73 and $218,156.73, respectively, would have been increased accordingly, or the expenses would have been allowed otherwise as deductions to the purchasing corporation. However, the respondent informs us on brief that neither has been done. He states that in accepting the basis for the cotton crop of $1,616,667.73 and the basis for the land preparation of $218,156.73 determined in accordance with the provisions of section 334(b)(2), he has allocated to the purchasing corporation a tax benefit corresponding to the expense deductions of the old corporation for the respective items and that the efficacy of such benefit is demonstrated by the large operating loss of $1,440,363.08 reported by the purchasing corporation for its fiscal year ended June 30, 1957. The respondent further states that obviously he could not have allowed the expense deductions in question to the purchasing corporation, in addition to accepting the above-mentioned amounts as the basis of the respective items, since the consequence of such a procedure would have been a shocking distortion of the taxable income of the purchasing corporation. Despite the foregoing the respondent contends that his action is in accord with the provisions of section 482.

From what has been said above, we think it is clear that under his alternative determination the respondent has not made an allocation of the expenses of the old corporation here in question to the purchasing corporation but merely has allowed to the purchasing corporation only the basis for the cotton crop and the basis for the land improvement which it was entitled to under section 334(b)(2) irrespective of any allocation to it of expenses of the old corporation.

The section of the Code of 1939 corresponding to section 482 of the Code of 1954 here involved is section 45. In considering section 45 in *Chicago & North Western Railway Co.*, 29 T.C. 989 (1958), it was held that the "distribution, apportionment or allocation" contemplated by the section implies an allowance somewhere else of the disallowed deduction, and that an allocation to a corporation of a deduction which the corporation already is entitled to under some other provision of the Code does not constitute an allocation within the contemplation of the section but in reality constitutes a mere disallowance of the deduction which the section does not permit. In our opinion the foregoing holding is applicable here and we accordingly conclude that respondent by his alternative determination has not made an allocation to the purchasing corporation of the expenses in question but merely has disallowed them to the old corporation which he may not do under section 482.

Having reached the foregoing conclusion and since the respondent states on brief that he does not rely on section 268 of the Code [5] in support of his alternative determination, we hold for the petitioners on this issue.

In view of our holdings above it becomes unnecessary to consider the remaining issues which arose solely by reason of the respondent's primary determination heretofore considered.

*Decisions will be entered under Rule 50.*

[5] SEC. 268. SALE OF LAND WITH UNHARVESTED CROP.
Where an unharvested crop sold by the taxpayer is considered under the provisions of section 1231 as "property used in the trade or business", in computing taxable income no deduction (whether or not for the taxable year of the sale and whether for expenses, depreciation, or otherwise) attributable to the production of such crop shall be allowed.