**AIKEN DRIVE-IN THEATRE CORPO-
RATION, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 8080.**

United States Court of Appeals
Fourth Circuit.

Argued May 27, 1960.

Decided July 26, 1960.

Robert L. Hines, Charlotte, N. C. (Richard E. Thigpen, Charlotte, N. C., on brief), for appellant.

Claron .C. Spencer, Attorney, Department of Justice, Washington, D. C.

(Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson and A. F. Prescott, Attorneys, Department of Justice, Washington, D. C., and James M. Baley, Jr., U. S. Atty., Asheville, N. C., on brief), for appellee.

Before BOREMAN, Circuit Judge, and THOMPSON and DALTON, District Judges.

### BOREMAN, Circuit Judge.

Aiken Drive-In Theatre Corporation, a South Carolina corporation, hereinafter called Aiken, prosecutes this appeal from the order of the United States District Court for the Western District of North Carolina dismissing its action against the United States to recover income and excess profits taxes paid by it for its fiscal year ending March 31, 1953.

Aiken was organized and incorporated in March 1952 to operate drive-in theatres and it operated the Fox Drive-In Theatre in the Aiken, South Carolina, area. The corporation was wholly owned by four stockholders.

On October 7, 1952, Aiken's four stockholders and three other stockholders holding minority interests organized the Tower Drive-In Theatre Corporation, hereinafter called Tower, for the purpose of purchasing the Tower Drive-In Theatre, also located in the Aiken, South Carolina, area. The theatre was purchased for $35,000, operations were begun and it operated successfully until the early part of 1954 when it started losing money. By June 1954, operations had been curtailed to week-end showings and still the losses continued. On June 3, 1954, the picture screen of the theatre sustained minor storm damage of about $500. No attempt was made to repair the damage even though the summer season, the most profitable season for drive-in theatres, was just beginning.

In August 1954, Aiken and Tower executed an agreement by the terms of which Aiken agreed to buy the Tower Drive-In Theatre from Tower at the value carried by Tower on its books, approximately $30,500. Aiken further obligated itself to pay to Tower the month-

ly rental that Tower was obliged to pay under the lease of the property upon which the theatre was located.

To effect the purchase, Aiken borrowed $30,500 from a bank on a note executed by Aiken but personally endorsed by each of its four stockholders. Thereupon, the borrowed money was transferred to Tower which, in turn, paid over such sum to its stockholders, the four individuals owning stock in both Aiken and Tower receiving approximately $24,500 of the $30,500. Tower was then dissolved and Aiken set up ownership of the Tower Drive-In Theatre on its books.

In October 1954, the Tower Drive-In Theatre suffered further and much more serious damage from hurricane "Hazel" which virtually demolished the screen tower and damaged the marquee and a pump motor on the premises. No effort was made to repair the damage, and in March 1955 Aiken decided to abandon the property. Aiken sold some of the salvaged equipment, retained some, notified the lessor of abandonment of the property, recorded the losses on its books and on its 1955 income tax return deducted $25,639.18 as an abandonment loss, rent in the amount of $840.00 paid under the Tower lease and $915.00 interest paid on the bank loan. A net operating loss, including the foregoing items, was carried back to 1953 and a refund received. Later, upon examination of Aiken's tax returns for the years 1953–1956, the District Director disallowed the deduction of the abandonment loss, the rent and interest paid, allocated said deductions back to Tower and assessed a deficiency against Aiken for the fiscal year ending March 31, 1953. The deficiency, as reduced by an overassessment

for the fiscal year ending March 31, 1954, was paid with interest and a claim for refund was filed. The claim for refund was rejected by the Commissioner of Internal Revenue on December 10, 1957, and Aiken instituted this action claiming that it is entitled to these deductions by virtue of Sections 162(a) (3), 163(a) and (b), 1011 and 1012 of the Internal Revenue Code of 1954, 26 U.S.C.A. §§ 162(a) (3), 163(a, b), 1011, 1012.[1]

The District Court found Aiken's claim to be without merit and concluded that the Commissioner did not act arbitrarily or capriciously in allocating to Tower the stated deductions claimed by Aiken in arriving at its net operating loss carryback. Such allocation, the District Court found, was proper under the provisions of Section 482 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 482.[2]

There is apparent agreement that if Section 482 is found to be inapplicable, Aiken is entitled to its deductions, its net operating loss carryback and its refund.

■ Section 482 was derived from former Section 45 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 45, which, in turn, was derived from Act of May 28, 1938, ch. 289, § 45, 52 Stat. 474. By this section the Commissioner is given the power to closely scrutinize all transactions, between mutually controlled corporations and to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer.

"His object is to arrive at the true net income of each controlled taxpayer and the technique used is the application of the standard of an uncontrolled taxpayer dealing at

---

1. These sections to which reference is made would normally be applied in determining the propriety of the claimed deductions.

2. § 482. Allocation of income and deductions among taxpayers

In any case of two or more organization, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

**10**

arm's length with another uncontrolled taxpayer. Whenever the lack of an arm's length relationship produces a different economic result from that which would ensue in the case of two uncontrolled taxpayers dealing at arm's length, the Commissioner is authorized to allocate gross income and deductions."

Commissioner v. Chelsea Products, Inc., 3 Cir., 1952, 197 F.2d 620, 623. See also Raymond Pearson Motor Co. v. Commissioner, 5 Cir., 1957, 246 F.2d 509, 514; Simon J. Murphy Co. v. Commissioner, 6 Cir., 1956, 231 F.2d 639, 644. Since this section grants the Commissioner discretionary powers, the burden falls on the taxpayer to prove that the Commissioner's determination is arbitrary. Commissioner v. Chelsea Prods., Inc., 197 F.2d at 624; G. U. R. Co. v. Commissioner, 7 Cir., 1941, 117 F.2d 187, 189.

■ Aiken did not meet its burden to show that the Commissioner acted arbitrarily. The Commissioner was confronted with a situation in which two controlled corporations entered into a contract of sale and purchase. The theatre which was the subject of the sale contract had not operated for about two months—a period in the height of the drive-in theatre season. About three months before the sale Mr. Beddingfield, Aiken's secretary and treasurer, had written a letter to the Internal Revenue Department relative to Aiken in which the following statement was made: "In this same town we have another operation by a different corporation, and this operation has been forced to reduce its activity * * * which has not been profitable and from all indications will have to cease operations completely within the next thirty days." Beddingfield acknowledged the signature on the letter to be his own and conceded that he was referring to the Tower Drive-In Theatre by his reference to "another operation." Also, in the protest filed with Internal Revenue and attested by Beddingfield, it was stated: "Tower had closed its drive-in theatre prior to August, 1954. Its

officers and directors realized the declining patronage of the theatres in the area and thought about liquidating."

All of these considerations, and the additional significant fact that Tower had already suffered sufficient losses to recover all the taxes it had ever paid, led the Commissioner to the rather convincing conclusion that the sale transaction was not in furtherance of any real and valid business purpose, and the sole objective of the transfer was to attribute the deductions and corresponding loss to Aiken which could utilize such loss to reap a tax benefit. We reach the same conclusion. Such shifting of the loss to Aiken gave an artificial picture of its true income and one which, under the circumstances, the Commissioner was not required to accept.

There is no merit in Aiken's contention that certain of the District Court's findings of fact were clearly erroneous within the meaning of Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. Considering the evidence and the inferences to be logically drawn therefrom, we are unable to say that the findings of fact, though somewhat inaccurate in certain relatively unimportant particulars, were clearly erroneous. We have carefully reviewed the record and we conclude that the District Court's major findings and conclusions are amply supported.

■ The answer to Aiken's contention that application of Section 482 is barred because it would run afoul of other provisions of the Internal Revenue Code is found in National Sec. Corp. v. Commissioner, 3 Cir., 1943, 137 F.2d 600, 602, certiorari denied 320 U.S. 794, 64 S.Ct. 262, 88 L.Ed. 479:

"* * * Section 45 [now section 482] is directed to the correction of particular situations in which the strict application of the other provisions of the act will result in a distortion of the income of affiliated organizations. In every case in which the section is applied its application will necessarily result in

an apparent conflict with the literal requirements of some other provision of the act. If this were not so Section 45 would be wholly superfluous. We accordingly conclude that the application of Section 45 may not be denied because it appears to run afoul of the literal provisions [of the Internal Revenue Code] if the Commissioner's action in allocating under the provisions of Section 45 the loss involved in this case was a proper exercise of the discretion conferred upon him by the section."

See also Advance Machinery Exchange, Inc. v. Commissioner, 2 Cir., 1952, 196 F.2d 1006, 1009.

■■ Aiken's final contention is that the District Court erred in upholding the Commissioner's use of Section 482 to "disallow" the claimed deductions; that this section can only be used to "distribute, apportion, or allocate" deductions. It is true that the District Court used the term "disallowed" when referring to the Commissioner's actions relative to the claimed deductions. However, a careful analysis of its findings and conclusions indicates that the term was used only with regard to Aiken's claim. Implicit in the disallowance of the loss to Aiken was the finding that the loss had been allocated to Tower. National Sec. Corp. v. Commissioner, 3 Cir., 137 F.2d 600, 603. This implicit finding is further bolstered by the District Court's statement of the objectives of Section 482, the powers it confers upon the Commissioner and the conclusion that the Commissioner did not act arbitrarily or capriciously in exercising these powers. Contrary to Aiken's suggestion, the fact that the allocation would have no practical effect on Tower's taxes under the circumstances here does not mean the deductions were disallowed. National Sec. Corp. v. Commissioner, supra, at page 603.

Affirmed.