**COMMISSIONER OF INTERNAL REVENUE, Petitioner,**

**v.**

**SOUTH LAKE FARMS, INC., Respondent.**

**COMMISSIONER OF INTERNAL REVENUE, Petitioner,**

**v.**

**SOUTH LAKE FARMS, Respondent.**

**Nos. 18018, 18019.**

United States Court of Appeals Ninth Circuit.

Nov. 22, 1963.

John B. Jones, Jr., Acting Asst. Atty. Gen., Lee A. Jackson, David O. Walter, and David I. Granger, Attorneys, Department of Justice, Washington, D. C., for petitioner.

Henry D. Costigan, Gordon M. Weber, and John B. Lowry, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for respondents.

Before HAMLIN and DUNIWAY, Circuit Judges, and JAMES M. CARTER, District Judge.

DUNIWAY, Circuit Judge.

The Commissioner of Internal Revenue seeks review of a decision of the Tax Court. That decision is reported at 36 T.C. 1027 (1961). The underlying facts are not disputed; most of them were stipulated. They are fully set forth in the findings of the Tax Court and are not attacked by the Commissioner, and we therefore do not repeat them here. We are of the opinion that the decision

of the Tax Court is correct for the reasons stated by it. We consider only those contentions made by the Commissioner before us. It is undisputed that the purchase by the new corporation of the stock of the old was an arm's length transaction between unrelated parties.

The Commissioner asserts here, as he did in the Tax Court, that the fair market value of the unharvested cotton crop planted and cultivated by the old corporation, but harvested by the new corporation, and the fair market value of the barley crop, which was both planted and harvested by the new corporation, were properly included by him in the income of the old corporation for its last taxable period which ended with its complete liquidation on October 3, 1956. He asserts authority to so include these items as income under the provisions of section 446(b) of the Internal Revenue Code of 1954 which states in part: "if the method [of accounting] used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income." The old corporation, which had been engaged for some years in the farming business, used the accrual method of accounting, as permitted under section 446(c) (2) of the Internal Revenue Code. At the time of its liquidation, on October 3, the cotton crop had not completely matured. Harvesting started on October 4 and continued into December. It is customary to start harvesting when 1/5 to 1/3 of the bolls have not yet opened. The barley crop had not even been planted, although considerable sums, which the Commissioner attempts to include in the corporation's income, as the fair market value of the not yet planted crop, had been spent by the old corporation in preparing land for the raising of barley.

The Commissioner is unable to point to any method of accounting which would require the inclusion of the items here involved in the old corporation's income. Indeed, he does not try. It is clear that the method of accounting that the old corporation had been using, namely, the accrual method, did not require their inclusion; *a fortiori*, the cash method would not do so. Under the published rulings of the Commissioner, not all of the events which fix the right to receive the income from the crops had occurred by the time of liquidation. (See Treas. Reg. (1954 Code) § 1.446-1(c) (1) (ii)) The crops could not be included in the inventory of the old corporation. (See Treas.Reg. (1954 Code) § 1.61-4(b)) In I.T. 1368, I-1 Cum.Bull. 72 (1922), the Commissioner ruled that: "While farmers may report their gross income upon the accrual basis (in which an inventory to determine profits is used), they are not permitted to inventory growing crops for the reason that the amount and value of such crops on hand at the beginning and end of the taxable year cannot be accurately determined." Nor can the only other method, authorized by the Commissioner, the so-called "crop method," be used. It applies only to "crops which take more than a year from the time of planting to the time of gathering and disposing" (Treas.Reg. (1954 Code) § 1.61-4(c)), and the crops here involved are not of that type.

None of the cases on which the Commissioner relies is in point. In most of them the liquidation of a corporation which was on a cash basis occurred at a time when income was fully earned, and the Commissioner, in order truly to reflect income, required that the corporation accrue these items in the year of dissolution. Idaho First Nat'l Bank v. United States, 9 Cir., 1959, 265 F.2d 6, involved interest earned but not yet payable at the time certain notes were distributed in liquidation. Commissioner of Internal Revenue v. Kuckenberg, 9 Cir., 1962, 309 F.2d 202, and Family Record Plan, Inc. v. Commissioner, 9 Cir., 1962, 309 F.2d 208, both involved moneys fully earned, some actually paid and some not yet payable at the time of liquidation. United States v. Lynch, 9 Cir., 1951, 192 F.2d 718, 721-22; Standard Paving Co. v. Commissioner, 10 Cir., 1951, 190 F.2d 330; Jud Plumbing & Heating, Inc. v. Commissioner, 5 Cir.,

1946, 153 F.2d 681; and Williamson v. United States, Ct.Cl., 1961, 292 F.2d 524, are similar. Here, on the other hand, no income had been earned at the time of the dissolution, and the growing cotton crops, which were harvested thereafter over a period of two and a half months, cannot fairly be said to represent accrued or accruable income. The case of the lands prepared for planting barley is even stronger, as the barley had not even been planted, much less begun to grow.

This is not a case in which the old corporation converted ordinary income to capital gain simply by selling growing crops before harvest as in the following cases: Watson v. Commissioner, 1953, 345 U.S. 544, 73 S.Ct. 848, 97 L.Ed. 1232; Bidart Bros. v. United States, 9 Cir., 1959, 262 F.2d 607. Here there was no sale by the old corporation; it was completely liquidated and its assets transferred to the new corporation, which owned all of its stock, and therefore section 336 of the Internal Revenue Code applies. Section 334 makes the new corporation, for tax purposes, in effect, the purchaser of the assets of the old, even though the new corporation bought stock. But section 336 makes it clear that the old corporation is not the seller of those assets for tax purposes. The tax falls on the actual sellers, the stockholders of the old corporation. Section 336 prevents the imposition of the tax on the old corporation. We need not decide, because the question is not before us, whether the result would have been the same if the old corporation had in fact sold the same lands and sought to escape tax under section 337.

Before the Tax Court, the Commissioner also claimed, alternatively, that he was entitled, under section 482 of the Internal Revenue Code, to disallow to the old corporation its expenses in producing the cotton crop and in preparing the barley lands for planting. In this proceeding he has abandoned that position and relies entirely upon section 446(b) to support the same result. We are of the opinion that section 446(b) cannot be so used. Just what "method of accounting" the Commissioner is requiring the old corporation to use for this purpose, he does not state. We can think of none that would apply. To use section 446(b) in this case as proposed would, we think, circumvent the provisions and purposes of sections 334 and 336 of the Code. Essentially, the Commissioner's position is that the old corporation got a "tax benefit" by deducting these expenses, all of which had been incurred or paid before liquidation. Such deduction was proper when taken. The contention is that because the price of the stock of the old corporation, which was sold to the new corporation, was fixed in part on the basis of the value of the cotton crop, and of the preparation of the land for a barley crop, and because an actual allocation of a portion of that price was made to those items, for the purpose of fixing the new corporation's basis under section 334, the old corporation received an amount equivalent to, and sufficient to offset, the expenses that it had incurred, and hence was no longer entitled to the "tax benefit" of the deduction of those expenses.

One immediate difficulty with this contention is that the old corporation received nothing. It was the stock of the old corporation that was sold, and the stockholders who got the money. The price that they got was higher because of the values added to the old corporation's assets by the expenditures that were made in preparing the barley lands and in preparing, planting, and growing the cotton crop. No doubt they paid tax on the increased gain. Nowhere in the Code do we find an intent that gains of the stockholders were to be attributed to the corporation, much less that they were to be treated as ordinary income to the corporation. The corporation is to be taxed only on its own income. (Cf. Family Record Plan, Inc. v. Commissioner, supra, at 210 of 309 F.2d)

Here again, the cases on which the Commissioner relies do not support him. Three of them (Citizens Fed.Sav. & Loan Ass'n v. United States, Ct.Cl., 1961, 290 F.2d 932; West Seattle Nat'l Bank v. Commissioner, 9 Cir., 1961, 288 F.2d 47;

and Commissioner of Internal Revenue v. First State Bank, 5 Cir., 1948, 168 F.2d 1004, 7 A.L.R.2d 738) involve deduction of bad debt reserves or write-offs. These differ from the expenses here involved, which are based upon out-of-pocket payments or fully incurred liabilities to third persons, whereas the reserves are based upon expectations rather than actual losses. In the case of bad debt reserves, the recovery of the deduction can fairly be said to occur at the time when the debts regain their full value, but in the case of actual expenses, the recovery requires that the taxpayer shall have received or become entitled to receive money or property equal to the amount previously spent and deducted. Here, the taxpayer, as we have already pointed out, received nothing. Section 446(b) was not relied upon in any of them. There is a special section (§ 111) relating to bad debts, which was cited in each of them, and includes a statutory "tax benefit" rule. No similar provision applies here.

Dobson v. Commissioner, 1943, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248, seems to us even less in point. It and its companion cases involved actual recoveries, in later years, of losses taken in earlier years, on sales of stock. We do not see any theory on which it can be fairly said that the old corporation has recovered the expenses which it deducted.

The result in this case is something of a tax windfall to the stockholders of the old corporation. They got a price for their stock that was enhanced by their corporation's expenditures, which were deducted from its income, thereby reducing its income taxes, even though it never got the income that the expenditures were expected to produce. It may be that if Congress had considered the problem now before us when it enacted sections 334, 336, and 337 of the Internal Revenue Code, it would have inserted language designed to reach one or the other of the results here sought by the Commissioner. But it did not do so. Moreover, it was aware of the problem of how to treat the proceeds of the disposition of lands having growing crops upon them in another context, namely, a sale. (See Internal Revenue Code §§ 268, 1231(b)(4)) Yet the Commissioner disclaimed reliance on section 268 before the Tax Court, and does not rely on it here, presumably because, as we have already pointed out, there was no sale of the unharvested crop in this case. If the result here is undesirable, the remedy is for Congress, not the courts.

The decision of the Tax Court is affirmed.

JAMES M. CARTER, District Judge (dissenting).

I respectfully dissent.

The case presents a question of whether a farm corporation can avoid its liability for tax upon ordinary income earned by it but not actually collected or realized as of the date the corporation is dissolved by another corporation, which purchases all of its stock.

The problem concerns Sections 334 and 336, and the impact thereon of Sections 446 and 482, all in the 1954 Internal Revenue Code; and whether the tax principles of "Assignment of Income" and "Tax Benefit" should apply.

The "Old Corporation" expended large amounts for the making of a cotton crop, ($497,641.93) and the preparation of land for a barley crop, ($215,060.50) and took deductions in its income tax returns. The "Purchasing Corporation" harvested the cotton crop at a cost of $271,505.56 and received gross proceeds of $1,855,518.68; planted the prepared barley lands and received the income from the crop raised.

The Tax Court and the majority of this Court now hold that the "Old Corporation" may have its deductions for making the cotton crop and preparing the land for the barley crop, and that the "Purchasing Corporation" may have the proceeds of the crops free from any income tax, and from any tax at all, from any one, except insofar as the stockholders of the "Old Corporation" pay a capital

gains tax on any consideration passing to them relating to the crops.

The result is unjustified, inequitable, contrary to the intention of Congress and shocking in its implications.

## THE FACTS

South Lake Farms, Inc., hereafter referred to as the "Old Corporation" was a California corporation, engaged in the business of farming; was on an accrual basis and its fiscal years ended on April 30th. The years in question are the fiscal year ending April 30th, 1955; the fiscal year ending April 30th, 1956, and that portion of a year from May 1st, 1956, through October 3rd, 1956, the date of its liquidation.

South Lake Farms, hereafter referred to as the "Purchasing Corporation" is a California corporation, its fiscal year running 7/1/56–6/30/57. Occasionally herein the two corporations will be referred to as the "Farm Companies."

The "Old Corporation" had been engaged in farming in Tulare, Kings and Kern counties, in the San Joaquin Valley, California. During the summer of 1956, its farm operations were conducted on owned and leased land, totaling in excess of 76,000 acres. The "Old Corporation" was on an accrual basis and crops unharvested at the end of each fiscal year were not inventoried or otherwise included in gross income until the following year, when they were harvested.

The stock of the "Old Corporation" as of September 1956 was owned by approximately thirty individuals, most of them members of the Hill family. On September 7th, 1956, Carl and Kenneth Quandt made an offer to the owners of all the capital stock of the "Old Corporation" to purchase, either by them, or by a corporation to which their rights might be assigned, all of the capital stock of the "Old Corporation" and in addition the interest in two partnerships, for $5,000,000. The offer was conditioned on the accomplishment of all necessary steps to the dissolution of the "Old Corporation" on or before October 5th, 1956. The offer was accepted.

Both the offerors and the offerees expected that the harvest of the "Old Corporation's" 1956 cotton crop would commence on or shortly after October 5th, 1956.

The Tax Court found that the estimated value of the "Old Corporation's" unharvested crops and land preparation were taken into account by the parties in fixing the purchase price of the "Old Corporation" stock. And found also that the possibility of a substantial refund of federal income tax to the "Old Corporation," as the result of an anticipated net operating loss sustained by the "Old Corporation" during its final taxable period was also taken into account by the parties in fixing the purchase price of the stock of the "Old Corporation."

The Quandts and some associates other than the stockholders of the "Old Corporation" organized a new corporation, the "Purchasing Corporation" referred to above, South Lake Farms, and assigned their rights to the new corporation, which on September 29th, 1956, purchased all the outstanding shares of the "Old Corporation" stock. The purpose of the "Purchasing Corporation" was to immediately dissolve the "Old Corporation" and take over its assets.

The sole shareholder of the "Old Corporation" was now the "Purchasing Corporation," and on October 2nd, 1956, a plan of dissolution and complete liquidation of the "Old Corporation" was adopted.

All necessary steps were taken for dissolution of the "Old Corporation," and on October 3rd, 1956, all the assets of the "Old Corporation" were distributed and transferred to the "Purchasing Corporation," subject to the debts and liabilities of the "Old Corporation," without any payment to the "Old Corporation" by the "Purchasing Corporation." Thereupon the "Old Corporation" had no assets.

The assets distributed to the "Purchasing Corporation" consisted in part, of lands and leaseholds, and the unharvested 1956 cotton crop, and the preparation made on certain lands for a later

planting of a barley crop to be harvested in 1957.

THE COTTON CROP

The cotton crop of 5,100 acres of land, including 3,925 acres leased land had been planted before April 30th, 1956. Expenses in the amount of $497,641.93 had been incurred in connection with its planting and growth. This figure was made of two items:

(1) $254,566.91, representing expenses incurred during the period May 1st, 1956 through October 3rd, 1956, the final fiscal period of the "Old Corporation," and this amount had been included in deductions taken by the "Old Corporation" for that period in its income tax returns.

(2) The sum of $243,075.02 incurred during the fiscal year May 1st, 1955–April 30th, 1956, which were taken as deductions in the "Old Corporation's" income and tax return for that period.

The cotton crop was then harvested by the "Purchasing Corporation" between October 4th, 1956 and December 17th, 1956, at a cost of $271,505.56. The gross proceeds from the crop were $1,855,518.68.

The "Purchasing Corporation", pursuant to section 334(b) (2) of the Internal Revenue Code of 1954 allocated its adjusted basis of the stock of the "Old Corporation" to various assets. The adjusted basis of the stock allocated to the cotton crop was $1,616,667.73. To make the allocation the "Purchasing Corporation" made estimates of the fair market value as of the date of liquidation of the assets of the "Old Corporation" and thus estimated the fair market value of the cotton crop as of October 3rd, 1956, as $1,593,619.44. The "Purchasing Corporation" for this fiscal year, July 1st, 1956—June 30th, 1957, included in gross receipts the proceeds from the cotton crop $1,855,518.68 and offset against these gross receipts—

(1) The cost of harvesting the cotton, $271,505.56 and (2) the portion of its adjusted basis for the stock allocated to the cotton crop, $1,616,667.73.

THE BARLEY LAND

The "Old Corporation" had prepared approximately 13,000 acres of land, 1000 of which were leased, for the planting of a 1956–1957 barley crop. The barley crop was planted by the "Purchasing Corporation" at an undisclosed expense, after its receipt of the assets of the "Old Corporation" and between November 5th and December 15th, 1956. However, the "Old Corporation" had incurred expenses in preparing the land, totaling $215,060.50. This figure consisted of two items—

(1) $170,223.91 incurred during the last fiscal period of the "Old Corporation" May 1st, 1956–October 3rd, 1956, which had been included in the deductions taken in the "Old Corporation's" federal income tax return.

(2) $44,836.59 incurred during the fiscal year of the "Old Corporation," May 1st, 1955 to April 30th, 1956. This likewise had been included in the deductions taken by the "Old Corporation" in its federal income tax return for that fiscal year.

The "Purchasing Corporation," in making its adjustment, allocated to its adjusted basis of the stock of the "Old Corporation" $218,156.73 for the land preparation for the barley crop. It estimated the fair market value of such preparation as of October 3rd, 1956, to be $215,060.50.

The barley crop was harvested at an undisclosed cost by the "Purchasing Corporation" which had planted it. The harvest occurred between May 26th, 1957 and July 10th, 1957, and brought in an undisclosed amount. However, the "Purchasing Corporation" included in its gross receipts, the sale from the barley crop and offset against the gross receipts, two items—

(1) Its cost of planting, growing and harvesting barley;

(2) A portion of its adjusted basis of the stock of the "Old Corporation" relating to the land preparation, namely $218,156.73.

THE INCOME TAX RETURNS OF THE OLD CORPORATION AND THE PURCHASING CORPORATION.

(a) *The "Purchasing Corporation."*

For its fiscal year July 1st, 1956 to July 30th, 1957, the "Purchasing Corporation" reported a net loss of $1,440,363.08.

(b) *The "Old Corporation."*

For its last fiscal period May 1st, 1956 through October 3rd, 1956, the "Old Corporation" reported a net operating loss of $150,618.26. The "Old Corporation" also filed with the Commissioner an application for carry-back losses as follows:

(a) Fiscal year ending April 30th, 1955 a loss of $77,941.38;

(b) Fiscal year ending April 30th, 1956 $72,676.88. Each was originally allowed.

THE ACTION OF THE COMMISSIONER

The Commissioner determined there was a deficiency in the "Old Corporation's" income tax for the last fiscal period, May 1st, 1955 to October 3rd, 1956. He took two alternative positions:

(1) He determined that the "Old Corporation's" taxable income in its last fiscal period, 5/1/56–10/3/56, should be increased by $1,808,679.94 but then offset the reported net loss of $156,618.26 and determined a net taxable income of $1,-658,061.68 for that taxable period. He explained his action by pointing out that growing crops (cotton crop and land preparation) valued at $1,808,679.94 were distributed by the "Old Corporation." Costs and expenses allocated to these growing crops had been deducted by the "Old Corporation;" that the method of accounting employed did not properly reflect income under the 1954 Code and accordingly increased the income by the value of the growing crops at the date of liquidation.

(2) Alternatively, if it was finally determined that the value of the crops was not includable in the "Old Corporation's" return for its final fiscal period, he determined the income for such period should be increased by the amount of $847,632.-58, representing the determined expenses attributable to such crops and previously deducted by the "Old Corporation." This figure was later corrected by the government in its brief, to $712,702.43.

Finally, the Commissioner, having determined that the "Old Corporation" had no taxable loss under either alternative for the period May 1st, 1956 through October 3rd, 1956, disallowed a net loss carry-back for the two preceding fiscal years ending April 30th, 1955 and April 30th, 1956, and determined the deficiencies involved herein for those years.

THE SHOCKING RESULTS

The results are as follows:

(1) The "Old Corporation" deducted in its income tax returns

| | | |
|---|---|---|
| | $497,641.93 | for the cotton crop |
| and | $215,060.50 | for preparing the barley land. |
| Total | $712,702.43. | |

It reported an operating loss in the last partial fiscal year and claimed a carry-back loss to the two prior years. *The losses were in connection with crops it never harvested.*

(2) The "Purchasing Corporation" in its fiscal year 7/1/56–6/30/57 as to the *cotton crop alone* offsets against its cotton crop receipts of $1,855,518.68—the following:

| | |
|---|---|
| $ 271,505.56 | cost of harvesting |
| $1,616,667.73 | Adjusted bases of cotton crop |
| $1,888,173.29 | |

which alone means a loss of $32,654.61.

We do not have the figures as to the barley crop but we know the adjusted basis as to barley crop—$218,156.76—was deducted and we know the purchasing corporation showed a total operating loss of $1,440,363.08.

The purchasing corporation *received the benefits of the making of the cotton crop and the barley land preparation without having to pay for them.*

(3) The stockholders of the "Old Corporation" paid a capital gain tax on the *capital assets* distributed and *their appreciation.* This was proper.

However, the Tax Court found that part of the consideration paid for the assets distributed was for the growing cotton crop and the preparation of the barley land. The purchasing corporation fixed fair market value as to these at

| | |
|---|---|
| $1,593,619.44 | cotton crop |
| $ 215,060.50 | barley land |
| $1,808,679.94 | |

as of the date of liquidation on October 3, 1956.

Regardless of whatever amount was considered in the bargaining as the value of these so-called "assets," they were *taxed to the shareholders of the "Old Corporation" at capital gain rates.*

It is obvious the tax on these items which were part of the purchase price paid, was smaller in amount than had they been taxed as income.

In addition, the shareholders having rid them of this income, also benefited from the loss of the "Old Corporation" in its last fiscal year and the carry-back loss to the two prior years.

To say the least, these results are absurd, not within the contemplation of Congress in adopting the 1954 Code and certainly called on the Commissioner to exercise the discretion given him under sections 446 and 482, to make returns properly reflect income or to utilize "Tax Benefit" and "Assignment of Income principles" of Tax Law.

These results, with equal force, called up the Tax Court and this Court to utilize the case law of taxation and the provisions of the 1954 Code to prevent such results.

## THREE TAX PRINCIPLES

There are three tax principles which appear throughout the case law of taxation:

1. The "Tax Benefit" principle, namely that he who receives the benefit must pay the tax;

2. The "Assignment of Income" principle, in short that the burden of the tax may not be avoided by the assignment of income;

3. The application of proper accounting principles or methods.

## ASSIGNMENT OF INCOME and TAX BENEFIT

The main stream of tax law on the principles of "Assignment of Income" and "Tax Benefit" are not hard to follow.

Lucas v. Earl, (1930) 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731, held that a contract by a husband giving to his wife portions of his income from personal services would not result in a shift of the tax burden from himself to his wife. Judge Holmes uses the oft' quoted phrase, "* * * anticipatory arrangements * * * by which the fruits are attributed to a different tree from that on which they grew" will not shift the tax.

There were intermediate cases, but in 1940 Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75, was decided, holding that a father could not shift the burden of a tax on interest by giving away a bond coupon prior to its due date. Helvering v. Eubank, (1940) 311 U.S. 122, 61 S.Ct. 149, 85 L.Ed. 81, relied on Horst and concerned renewal commissions on insurance policies. Here the future income was contingent but no further services were required.

Subsequently the Supreme Court in Commissioner of Internal Revenue v. Culbertson, (1949) 337 U.S. 733 at 739–740, 69 S.Ct. 1210, at 1213, 93 L.Ed. 1659, referred to "the first principle of income taxation: that income must be taxed to

him who earns it." The foregoing cases in general distinguished gifts of "property" from gifts of "right to income." The next step was to apply the same rule to commercial transactions with a slightly different question—not *who* was taxable but whether the *rate* should be that of ordinary income or capital gain.

In Commissioner of Internal Revenue v. P. G. Lake, Inc., (1958) 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743, the Supreme Court refused to permit a claim of capital gain tax on a sale of oil payments, where they had been "carved out" of retained working or royalty interests. The Court considered the money received as a mere substitute for future ordinary income.

The article "Assignment of Income: Fruit and Tree as Irrigated by the P. G. Lake Case,"[1] by Charles S. Lyon and James S. Eustace, 17 Tax Law Review, 295 at 300, states: "Assignment doctrine extends beyond sales and gifts. It may reach corporate distributions to shareholders, * * * non-recognition type of transfers in corporate organization or reorganization, and possibly also sales by corporations relying on section 337, * * *. Assignment doctrine merges into several other vague but important principles and provisions. There is much overlap with tax benefit and proper accounting principles. * * * There is much overlap in function also with the principle that substance prevails over form and the special sub-principle thereof associated with the Gregory case. (Gregory v. Helvering, 1935, 293 U.S. 465 [55 S.Ct. 266, 79 L.Ed. 596, 97 A.L.R. 1355] ). In fact one might think of assignment doctrine as a part of the substance-over-form principle."

The "Assignment of Income, etc.," article, (supra) states further at 303, "At the very minimum Lake (Commissioner v. P. G. Lake Inc., 356 U.S. 260 [78 S.Ct. 691, 2 L.Ed.2d 743]) has served to refuel the assignment of income doctrine and the canons of statutory construction that 'Capital gains are the exception to the general rule of ordinary income treatment, and therefore the definition of capital asset must be narrowly applied and its exclusions interpreted broadly.' " Citing Corn Products Refining Co. v. Commissioner, (1955) 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29.

*"Assignment of Income etc.,"* (supra) further states at P. 396:

> "It is clear from the cases that assignment of income principles can apply with respect to corporate distributions to shareholders. Behind this simple statement lies a rich historical background and a tie-in with numerous complexities of tax doctrine and policy: our system of 'double taxation' of corporation and shareholder; the rate differential between capital gain and ordinary income; the general pattern for treating corporate liquidations; the special pattern for 'collapsible corporations' in section 341; the Court Holding Company approach in cases not covered by section 337; the doctrine of Burnet v. Logan [283 U.S. 404, 51 S.Ct. 550, 75 L.Ed. 1143] as to 'ascertainable' value; tax benefit principles; and broad provisions of the Code calling for proper tax accounting, notably section 446 requiring a 'method of accounting' that will 'clearly reflect income,' and section 482 requiring proper allocation of business income and deductions between related taxpayers."

1. The Farm companies suggest that Prof. Lyon in 17 Tax Law Review 293, "inspired the Commissioner's present position * * *". Actually the 135 page article is an excellent review of current tax law and only a small portion of the article refers to the Tax Court decision below in 36 T.C. 1027. We find the article most helpful.

The article is cited in Bisbee-Baldwin Corp. v. Tomlinson, (5 Cir. 1963) 320 F. 2d 929. This case is in line with the authorities cited herein and is contra to the general position of the Tax Court and the views of the majority herein.

SECTIONS 311, 334, 336 and 337

We turn to the question of the application of the "Assignment" and "Tax Benefit" principles in situations between a corporation and its shareholders and in situations where "Non-recognition of gain" statutes are involved.

Section 336 of the Internal Revenue Code of 1954 provides * * * "no gain or loss shall be recognized to a corporation on the distribution of property in partial or complete liquidation." This was a codification of the case law as it then stood, holding that a corporation should not be taxed upon the *appreciation* in value of its *property* when distributed to its shareholders. Section 311 of the Internal Revenue Act of 1954 applied a similar rule to non-liquidating distributions to shareholders.

Each of the sections uses the word "property". Section 311 also refers to "stock" distributions. Neither section refers to *"income."* The committee report on section 311, Senate Report No. 1622, 83rd Congress, 2nd Sess. 247, U.S. Code Cong. and Admin.News 1954, p. 4884 states that section 311 was not intended "to change existing law with respect to attribution of income of shareholders to their corporation as exemplified for example in the case of Commissioner [of Internal Revenue] v. First State Bank of Stratford," (5 Cir. 1948, 168 F.2d 1004, 7 A.L.R.2d 738).

As to section 336, the same view was taken in Williamson v. United States, in the Court of Claims, (1961) 292 F.2d 524.

The easiest way to sell an incorporated business has always been to have the corporation sell its assets for cash or equivalent and then to distribute the proceeds to its shareholders in liquidation. In such a case before the 1954 Code, where the corporation had a low basis for its assets and the stockholders had low bases for their stock, this method involved a double tax—one on the corporation on its gain and a second on the shareholders on their gain.

Attempt was then made to have stockholders liquidate their corporation first, securing to them direct ownership of its assets and then sell the assets to a purchaser. Commissioner of Internal Revenue v. Court Holding Co., (1945) 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 held that this did not avoid the double tax if the corporation had first negotiated the sale. Subsequently, United States v. Cumberland Public Service Co., (1950) 338 U.S. 451, 70 S.Ct. 280, 94 L.Ed. 251 held that if the corporation at all times refused to negotiate for the sale to the ultimate purchaser, and the stockholders themselves had only agreed to sell to the ultimate purchaser and the stockholders themselves had only agreed to sell the assets after receiving them in liquidation, then there was only one tax on the stockholders and none on the corporation.

Under case law there arose the Kimbell-Diamond Rule, starting from Kimbell-Diamond Milling Co. (1950) 14 T.C. 74, affirmed (5 Cir. 1951) 187 F.2d 718, cert. den. 342 U.S. 827, 72 S.Ct. 50, 96 L.Ed. 626, where the purchasing corporation for tax purposes is to be treated as the direct purchaser for full value of the business and assets of the old corporation; and permitting a single capital gains tax. Despite sections 112(b) (6) and 113(a) (15) of the 1939 Code the rule became settled in case law by the time of the 1954 Revision of the Internal Revenue Code.

It will be noted that in each of these situations there was involved only the matter of assets and not income.

PROVISIONS OF 1954 CODE

In the 1954 Code, the Congress passed three sections that dealt with this general problem.

(1) One section was sec. 334(b) (2), I.R.C. of 1954. This permitted the taxpayer primarily interested in the corporation's assets to first purchase the stock and then liquidate the corporation in order to secure the desired assets. The matter would be treated as a single transaction with a single capital gain tax.

House Report 1337, 83rd Congress, 2nd Sess. p. A–109 states section 334 will "permit the taxpayer to retain" (with exceptions) "as the basis for the assets received in complete or partial liquidation, the adjusted basis for his stock thus effectuating the principles of Kimbell-Diamond Milling Co. v. Commissioner." See U.S.Code Cong. and Admin.News 1954, p. 4247.

(2) Section 336, I.R.C. of 1954, which was really a codification of United States v. Cumberland Public Service, Inc., (supra) permitted stockholders to sell corporate properties after liquidation at a single capital gain.

(3) Section 337, I.R.C.1954, which permitted a corporation after adopting a plan to liquidate, to sell its *assets* without recognition of gain, on condition that the liquidation be substantially completed within one year. Here again there was only a single tax on capital gain rates.

It will be noted that all of these sections apply to corporate assets and not to income.

The Farm companies spend 14 pages of their brief (part One, I and II) to prove that Congress intended only *one capital gain tax* when a corporation distributed its properties in liquidation; and that such tax be paid by the old shareholders on the sale of their stock. They then state—

> "Therefore, we assert without any qualification that in the 1954 Code, which applies to the 1956 sale of the incorporated business here involved, Congress intended to permit the sale with only a single capital gain tax on the selling stockholders, regardless of which of the three methods should be followed."

Then counsel argue that therefore the one capital gain tax should mean that there should be *no income tax* nor any consideration of any income tax problem. As the learned Professor said to his law class, "I understand everything but the 'therefore' ".

## THE CASE LAW

We agree that the law provides for one capital gains tax on the sale of assets or appreciated assets *but what about income?* Various cases have held that assigned income is taxable. Often the decision is based upon one or more of the principles of—

(a) Assignment of income,

(b) Tax benefit, or

(c) Tax accounting principles.

Commissioner of Internal Revenue v. First State Bank of Stratford, (5 Cir. 1948) 168 F.2d 1004, 7 A.L.R.2d 738. Here the bank had charged off notes as wholly worthless and distributed the notes as dividends. The notes later appeared collectible. The Court held that the Bank could not avoid the tax, relying at length on the assignment of income cases, including the Horst case (supra), (311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75). Tax benefit principles are referred to in the concurring opinion approved by a majority of the judges, (p. 1011 of 168 F.2d.). The court inferentially refers to tax accounting principles in its statement that "[c]onsistency is essential to fairness in income-tax accounting." (p. 1009 of 168 F.2d).

In Williamson v. United States, (C.Cl. 1961) 292 F.2d 524, accounts receivable were distributed to shareholders. The opinion relied on assignment of income principles and cited Horst, (supra). It also cites cases based on proper methods of accounting.

Carter (1947) 9 T.C. 364, affirmed on other issues, (2d Cir. 1948) 170 F.2d 911, like Williamson (supra), involved distribution of receivables, namely oil brokerage commissions. The corporation was on a cash basis but the Tax Court required the items to be reported as income in the year of liquidation as if the corporation was on an accrual basis. The Court relies upon proper methods of accounting, but also talks in terms of assignment of income. "* * * The corporation had fully earned the income * * * the contracts had been fully performed * * * the corporation had

sent out bills for its earnings." (9 T.C. at 373–374).

Jud Plumbing & Heating, Inc. v. Commissioner, (5 Cir. 1946) 153 F.2d 681 and Standard Paving Co. v. Commissioner, (10 Cir. 1951) 190 F.2d 330, involved liquidating distributions of construction contracts using the completed contract method of reporting. After the contracts were completed by the shareholders, the Commissioner allocated between the corporations and the shareholders on a basis of a percentage of completion method. The Court of Appeals sustained the Commissioner, relying on section 446 and section 482. The Court said that a "* * * corporation being a separate legal entity, its net earnings, whether ascertained or not, belong to it," and that "it cannot avoid taxes by the simple expedient of not completing its contracts." (p. 685 of 153 F.2d). Thus, reliance was on a mixture of assignment of income and proper accounting principles.

In the Standard Paving case, (supra), the Commissioner had relied on proper accounting methods under section 41 (the predecessor of section 446). The Court sustained the Commissioner but in its opinion relied both upon the principles of proper accounting and assignment of income. The Court said, "a method should be adopted either by the taxpayer or by the Commissioner whereby the income is taxed to the person who earns it." (pp. 332–333 of 190 F.2d, citing Eubank, (supra), 311 U.S. 122, 61 S.Ct. 149, 85 L.Ed. 81; Horst, (supra), 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75; Lucas v. Earl, (supra), 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731, and Jud Plumbing, (supra)).

In Idaho First National Bank v. United States, (9 Cir. 1959) 265 F.2d 6, certain assets acquired by the liquidating company were notes receivable, upon which neither principle nor interest were due or payable at the time of liquidation. The liquidating bank had deducted expenses incident to these accounts. The Commissioner included the old Bank's income on the notes and the Court affirmed the action of the Commissioner, holding in substance that the liquidating bank realized income in the amount of accrued interest and that the interest was really collected as part of the purchase price of the stock. The Court relied upon both assignment of income and methods of accounting principles. The Court cited Horst, (supra), Jud Plumbing, (supra) and Standard Paving, (supra).[2]

"Assignment of Income: etc." (supra) summarizes at pp. 411–412:—

> "When the distribution of a potential income item avoids corporate tax thereon, should the corporation nevertheless be allowed the tax benefit of deductions for the costs of producing the item? This general question is most prominent in connection with distributions of dealer property, i. e., crops, inventory, or other property held primarily for sale to customers, since, as we have seen, this represents the broad category of potential ordinary income as to which there is a general rule of non-recognition on corporate distributions. One would think the general question would be easy to answer in the negative on one or more of the following grounds:
>
> "1. The corporate costs should not be deemed 'costs of goods sold,' since the goods are not in fact sold.
>
> "2. They should not be allowed as trade or business expenses under section 162, since they are not in fact paid or incurred 'in carrying on any trade or business' of the corporation. Though previously in the business of producing and selling goods for a profit, the corporation has abdicated by distributing the goods to its shareholders.
>
> "3. There is obviously no 'method of accounting' that will 'clearly reflect income,' in the words of section

2. United States v. Eidson, (5 Cir. 1962) 310 F.2d 111, a late case, is pure "Assignment of Income" case and in line with the mainstream of current tax law.

446, if deductions are taken despite exclusion of the income to which they relate.

"4. The corporation and its shareholders are related 'organizations, trades, or businesses,' within the meaning of section 482. Thus, the deductions should be denied to the corporation 'in order * * * clearly to reflect the income' of the related parties.

"5. Where the costs have been deducted in prior years, tax benefit principles should require the corporation to report a corresponding income item in the year of distribution. As may happen in the case of deductions for bad debts or taxes, a deduction has been taken on a premise—in this case, that the property will be sold in the course of the corporate business—which later proves incorrect.

"6. It is a cardinal principle of assignment doctrine that income should be taxed 'to him who earns it,' and this principle would be frustrated unless applied to net income."

### SECTIONS 446(b) AND 482 OF INTERNAL REVENUE CODE OF 1954.

Sections 446(b) and 482 of the Internal Revenue Code of 1954 are carryovers from sections 41 and 45 respectively of the Internal Revenue Code of 1939.

The intent of each section is clear, to give the Commissioner of Internal Revenue the power to require the use of a method of accounting which will "clearly reflect income."

Section 446(b) states in part "* * * if the method used [by the taxpayer] does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income."

The section applies to *all* taxpayers and is therefore broader than section 482.

"§ 482. Allocation of income and deductions among taxpayers

"In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) *owned or controlled directly or indirectly by the same interests*, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses. Aug. 16, 1954, 9:45 a.m. E.D.T., c. 736, 68A Stat. 162." [Emphasis supplied.]

Section 482 is limited by the emphasized words above and applies when there exists such type of control.

The impact or purported conflict of these sections with other sections of the Internal Revenue Code of 1954 have been considered in various cases and the better reasoned cases held that the Commissioner's action will be sustained if he has properly exercised his discretion and has not acted arbitrarily or capriciously.

(a) *Section 446(b) cases*—Automobile Club of Mich. v. C. I. R., (1957) 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746; reh. den. 353 U.S. 989, 77 S.Ct. 1279, 1 L.Ed. 2d 1147; Whitaker's Estate v. C. I. R., (5 Cir. 1958) 259 F.2d 379; Wood v. C. I. R., (5 Cir. 1957) 245 F.2d 888.

(b) *Section 482 cases*—Peacock v. C. I. R., (5 Cir. 1958) 256 F.2d 160; Rooney v. United States, (9 Cir. 1962) 305 F.2d 681.

There are other cases which severely limit the power and authority of the commissioner under these sections. We would not follow these cases—Simon J. Murphy Co. v. C. I. R., (6 Cir. 1956) 231

F.2d 639; Tillotson v. McCrory, (D.C. Neb.1962) 202 F.Supp. 925.

The fact that sections 446(b) and 482 appear to run afoul of other sections providing for non-recognition of tax in certain situations, does not bar their application.

This has been clearly held in section 446(b) cases—Fort Pitt Brewing Co. v. C. I. R., (3 Cir. 1954) 210 F.2d 6; Jud Plumbing & Heating Co. v. C. I. R., (5 Cir. 1946) 153 F.2d 681; C. I. R. v. Kuckenberg, (9 Cir. 1962) 309 F.2d 202, cert. den. 373 U.S. 909, 83 S.Ct. 1296, 10 L.Ed.2d 411; Family Record Plan v. C. I. R., (9 Cir. 1962) 309 F.2d 208, cert. den. 373 U.S. 910, 83 S.Ct. 1297, 10 L. Ed.2d 411; and likewise in section 482 cases—Aiken Drive-In Theatre Corp. v. United States, (4 Cir. 1960) 281 F.2d 7; Rooney v. United States, (9 Cir. 1962) 305 F.2d 681.

### METHODS OF ACCOUNTING

Section 446 is entitled "General rule for methods of accounting"; subdivision (c) thereof lists the following methods of accounting—

> (1) The cash receipts and disbursement methods
>
> (2) The accrual method
>
> (3) Any other method permitted by this chapter
>
> (4) Any combination of the foregoing methods permitted under rules prescribed by the Secretary or his delegate.

My colleagues say that a change to the "cash" method would not bring, in this case, a different result. There are other approved methods of accounting besides the cash and the accrual method. See C. I. R. v. Kuckenberg, (9 Cir. 1962) 309 F.2d 202 at 207. Here the Circuit affirmed the Commissioner and the Tax Court on a change from a "completed contract" method to a "percentage of completion of contract" method. The Circuit relied on Jud Plumbing & Heating v. Commissioner, (5 Cir. 1946) 153 F.2d 681, and Standard Paving Co. v. Commissioner, (10 Cir. 1951) 190 F.2d 930.

Here is authority for two other methods in addition to the cash or accrual methods.

Halstead, "Federal Income Taxation on Farmers" (1956) published by the Committee on Continuing Legal Education of the American Bar Institute collaborating with the American Bar Association, on pages 25 and 26 discussed the crop method which ordinarily applies to a farmer producing crops which take more than a year from planting to harvest. Proceeding further, the author states that the provision in Regulations 118 concerning the crop method "is not authority for and has nothing to do with the practice followed in some farm operations of deferring expenses incurred in producing a crop which, although it will be harvested within twelve months of the planting date, will be harvested in a taxable year following the year in which the date of planting falls. While this latter practice may be sound accounting and may be acceptable to the Treasury on audit on the ground that it clearly reflects income, and is consistently followed by the taxpayer, there is no provision in the code or regulations, and no published rulings which may be cited as clear authority for the practice.

Here we have another method of accounting which although as yet not expressly authorized by the code or by regulation is apparently in use and apparently not seriously questioned.

### THE TAX COURT OPINION

The opinion of the Tax Court lists the position of the Commissioner as contending that section 446(b) was applicable in that the method used by the "Old Corporation" did not clearly reflect income.

As to the positions of the Farm companies, the Tax Court states:

> "The petitioners take the position that section 446(b) and the cases relied on by the respondent [Commissioner] are inapplicable here * * *but is an attempt by respondent to*

*disregard the provisions of Sec. 336 of the Code,* which prohibits the recognition of any gain or loss to the old corporation on the distribution of its property to the purchasing corporation in complete liquidation." [Emphasis supplied.]

Thus, although the Tax Court opinion states that the Commissioner "urges that consideration of the applicability of section 336 to the distribution by the old corporation is *not essential to a determination of the correctness of his exercise of his powers under Sec. 446,*" [Emphasis supplied] the Tax Court never met this issue.

The issue as stated by the Tax Court ignores the impact of Sections 446(a) and 482 on Section 336; and begs the question—suppose the adjustment by the Commissioner is proper, what then?

The Tax Court seems to view section 336 as an absolute that cannot be affected by other sections of the code.

We have seen that section 351 is not absolute but must yield to section 482, if the Commissioner's action is not an abuse of discretion, Rooney v. United States, (9 Cir. 1962) 305 F.2d 681; that section 337(a) must yield to section 446 (a) if the Commissioner's action is not an abuse of discretion, C. I. R. v. Kuckenberg, (9 Cir. 1962) 309 F.2d 202, cert. den. 373 U.S. 909, 83 S.Ct. 1296, 10 L. Ed.2d 411; Family Record Plan v. Commissioner, (9 Cir. 1962) 309 F.2d 208, cert. den. 373 U.S. 910, 83 S.Ct. 1297, 10 L.Ed.2d 411.

A taxpayer's accounting method under section 42 (1939 Code) Whitaker's Estate v. Commissioner, (5 Cir. 1958) 259 F.2d 379; or under Reg. 111, section 29.41-1 (1939 Code); Wood v. Commissioner, (5 Cir. 1957) 245 F.2d 888; or under section 101(9) of the Code of 1939 and a prior ruling of the Commissioner, under which the taxpayer acted, Automobile Club v. Commissioner, (1957) 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746; must each yield to a proper exercise of the Commissioner's discretion under section 41, 1939 Code (now section 446), 1954 Code.

The Tax Court opinion, in addition to treating section 336 as an absolute, never to be effected by section 446 or 482, also refers to the "Assignment of Income" cases. It distinguishes these cases by citing Blair v. Commissioner, 300 U.S. 5, 12, 57 S.Ct. 330, 81 L.Ed. 465. There the holding was that there had been an equitable transfer of the corpus, and accordingly an assignment of income from the trust caused the tax liability to fall upon the party receiving the income. Review of the Supreme Court cases citing Blair indicates that it must rest on its own facts. In addition it has been used in the dissents in Horst, (311 U.S. 112, 121, 61 S.Ct. 144, 85 L.Ed. 75) and Eubank, (311 U.S. 122, 127, 61 S.Ct. 149, 85 L.Ed. 81). It has not been a factor in the development of the case law on "Assignment of Income" or "Tax Benefit" principles. Nor did the Farm companies cite it or rely upon it.

The Tax Court relies almost solely on SoRelle, 22 T.C. 459 (1954). The writer would refuse to follow this case and does not think it represents the law. Apparently section 446(b) was not applied by the Commissioner. In addition the donees paid ordinary income tax on the proceeds of the crops.

The Farm companies state that the Commissioner has acquiesced in SoRelle, (supra). We note Rev.Rul. 55-531, 1955-2 C.B., 520 cited in the Farm Companies' appendix at 39. It refers to the acquiescence in C.B. 1955-1, 6. However, the Ruling then states, after discussing SoRelle, "(2) There must be an adjustment in the opening inventory in the year of the gift effecting the removal of the cost or other basis of the donated asset. *Items of cost applicable to such period are not deductible by the donor as an ordinary and necessary expense in the current or any subsequent year.*" [Emphasis supplied.]

In the Tax Court treatment of the alternative position of the Commissioner, only one case is relied upon as having considered Section 45 [present section 482]. This is Chicago & North Western Railway Co., 29 T.C. 989 (1958), which

is cited for the proposition that if a "distribution, apportionment or allocation" is made, that the section implies a requirement for an allowance elsewhere of the disallowed deduction. We think this an artificial requirement. Nor is the case cited or relied on by the Farm companies. No other cases are cited in support of this proposition.

The Tax Court opinion states that the Commissioner did not rely on section 268 in his brief in the Tax Court. Here the government cites and relies on section 268. The section provides, "Where an unharvested crop sold by the taxpayer is considered under the provisions of section 1231 as 'property used in the trade or business', in computing taxable income no deduction (whether or not for the taxable year of the sale and whether for expenses, depreciation, or otherwise) attributable to the production of such crop shall be allowed."

If a farmer *sold his land and the crop,* he obtained capital gain treatment under section 268, but "no deduction * * * attributable to the production of such crop shall be allowed." Here the deductions were taken.

Here, also, part of the land on which the crop was grown was leased and part owned. We think the leased land would not come within section 268. See Bidart Bros. v. United States, (9 Cir. 1959) 262 F.2d 607.

As to section 482, should it be ignored even if the government failed to discuss its application in its brief?

Here the "Old Corporation" distributed its assets to the "Purchasing Corporation" which had become its sole shareholder. The "Old Corporation" and its sole shareholder are related parties. We cannot understand the government's abandonment of any reliance on section 482.

CONCLUSION

The Ninth Circuit has been consistent in refusing to allow earned income to escape tax either by the taxpayers' use of section 337, Kuckenberg, (supra), and Family Record Plan, (supra); or by use of accounting methods improperly reporting income, Idaho First National Bank v. United States, (9 Cir. 1959) 265 F.2d 6; or by claiming reserves for bad debts were not taxable on dissolution, Arcadia Savings & Loan Association v. C. I. R. (9 Cir. 1962) 300 F.2d 247; West Seattle National Bank v. C. I. R., (9 Cir. 1961) 288 F.2d 47; or by claiming growing crops on a leasehold should receive capital gain treatment, Bidart Bros. v. United States, (9 Cir. 1959) 262 F.2d 607; or where no proper method of accounting is used, Palmer v. C. I. R., (9 Cir. 1959) 267 F.2d 434; or where transfers occur between related organizations and section 482 is applied, Rooney v. United States, (9 Cir. 1962) 305 F.2d 681; or by purporting to transfer rights in a motion picture, receive income as originally provided, and apply capital gain rates, Roth v. C. I. R., (9 Cir. 1963) 321 F.2d 607; or by using multiple corporations controlled by the taxpayer that performed no real business function and created no income, Shaw Construction Co. v. C. I. R., (9 Cir. 1963) 323 F.2d 316.

By the decision of the majority, this court takes a step backward. We ignore the "Assignment of Income" principle—that income cannot be assigned to another and taxation avoided. We ignore the "Tax Benefit" theory—that income should be taxed to him who earns it. We give a limiting interpretation to "method" in section 446 and say that since resort to the cash method would not change the situation that's the end of the story. We ignore the "percentage of completion" method by which liquidating corporations in the construction business have been required to report a portion of ultimate profit on pending contracts although in some cases the profit was contingent at the time of liquidation.

We permit the Tax Court to make an "untouchable" out of section 336 and therefore immune to the impact of section 446 or 482 and immune to "Tax Benefit" and "Assignment of Income" principles.

The Tax Court decision leaves many unanswered questions:

(1) Whether deficiency motions with attachments and explanations were suf-

ficient to raise an issue as to the fiscal year May 1, 1955 to April 30, 1956;

(2) Whether on impact between section 446(b) or 482 on the one hand and sections 334(b) (2), 336 and 337 on the other, the tax savings sections necessarily or ipso facto control over sections 446(b) and 482;

(3) Whether the Commissioner properly exercised his discretion in either of his alternative positions;

(4) Whether the word "method" in section 446(b) refers only to methods of accounting, such as the cash or accrual methods or includes other methods; whether taking deductions for producing farm income which was never received is a proper method of accounting?

(5) Is there or should there be a distinction between "uncompleted contracts," and "uncompleted or unharvested farm crops?"

(6) What is the Tax Court's view on application of the "percentage of completion" method as applied to this case?

(7) Did the Tax Court adequately consider "Assignments of Income" and "Tax Benefit" principles?

(8) Is there case law or theory supporting the Tax Court's reliance on Chicago & North Western Railway Co. (29 T.C. 989)?

(9) What of the Commissioner's treatment of SoRelle, (22 T.C. 459) in Rev. Ruling 55-531, 1955, 2 C.B. 520, providing deductions may not be taken by the donor in the year of a gift or subsequent years?

(10) What consideration is given to the fact that in these cases, the "Purchasing Corporation" had made an appraisal and fixed the fair market value of the cotton crop and the barley land preparations as of October 3, 1956?

(11) Are the "Old Corporation" and its sole shareholder the "Purchasing Corporation," related organizations under section 482?

(12) What is the effect of section 268?

(13) What is the Tax Court's view on transferee liability?

The writer does not think we should place the imprimatur "affirmed" on the decision of the Tax Court. We should remand for further trial and decision.

On remand, the Tax Court should take such additional evidence as is necessary to form a basis for answering our inquiries and render a decision in which it disposes of them.

I would reverse and remand.