**CITIZENS FEDERAL SAVINGS AND LOAN ASSOCIATION OF CLEVELAND**

v.

**UNITED STATES.**

No. 502–58.

United States Court of Claims.

June 7, 1961.

Harlan Pomeroy, Washington, D. C., for plaintiff. Norman A. Sugarman, Cleveland, Ohio, was on the briefs.

Jerry M. Hamovit, Washington, D. C., with whom was Asst. Atty. Gen., Louis

F. Oberdorfer for defendant. Lyle M. Turner and Eugene Emerson, Washington, D. C., were on the brief.

DURFEE, Judge.

The general question presented by this suit is whether or not a "Federal Insurance Reserve" deducted from income in previous years by a liquidated domestic building and loan association is taxable to a transferee building and loan association for the year in which it acquired all of the assets and liabilities of the liquidated association.

Prior to November 1955, the Berea Savings and Loan Company was a building and loan association operating in Ohio, as the plaintiff is at the present time. In July of that year, Berea's stockholders voted to accept plaintiff's offer to purchase Berea's assets and assume its liabilities. Negotiations for the transfer were undertaken and a plan of dissolution was adopted in October. On November 1, 1955, Berea sold plaintiff all of its business and property, subject to its liabilities, for about $414,000, an amount arrived at using a basis of $450 for each share of stock outstanding. The sale price was paid into a trust account for the benefit of the stockholders and Berea abandoned its corporate authority and franchise a short time later. Mortgage loans in the face amount of $3,160,805.-56, representing amounts loaned by Berea, were transferred to plaintiff.

On its corporation income tax returns for the years 1952 through 1954 and for the portion of 1955 before it ceased operations, Berea had deducted amounts from gross income in the aggregate sum of $133,361.17. In each case the amounts were equivalent to Berea's net income and were credited to a "Federal Insurance Reserve," (hereafter referred to as "reserve") described in the returns as a bad debt reserve. Because of amounts credited prior to 1952, the reserve was carried on Berea's balance sheet at $216,-715.93, as of October 31, 1955. Berea's final tax return disclosed the sale of the business during that year but it did not report any gain on the sale.

In 1957, the Commissioner of Internal Revenue determined that the amounts charged to the reserve from 1952 to 1955 should be lumped together and taxed as income for the tax period ended October 31, 1955. A deficiency of $63,754.80 for 1955 was asserted principally as a result of this adjustment. That amount, together with interest, was paid by the plaintiff as transferee of Berea and timely claim for refund was filed with the District Director of Internal Revenue.

The position of the Commissioner which resulted in the deficiency was that the reserve was a bad debt reserve which, because of the sale of the business, had lost its purpose so that the portion of the reserve which had originally conferred a tax benefit must be finally closed out to profit and loss and the remaining amount restored to surplus. The charges made to the reserve since 1952 had resulted in a tax benefit of $133,361.17, it was determined. Basically plaintiff's theory of recovery is that a liquidation of the kind here involved gives rise to no recognizable gain and that no part of the $133,361.17 is income for 1955 or any other year.

In its argument and briefs, the plaintiff immediately comes to the point of its presentation, namely, that sections 336 and 337 of the Internal Revenue Code of 1954 [1] provide that no gain shall be recognized to a corporation which dis-

---

1. Title 26 U.S.C.
 "§ 336. General rule
 "Except as provided in section 453(d) (relating to disposition of installment obligations), no gain or loss shall be recognized to a corporation on the distribution of property in partial or complete liquidation.

"§ 337. Gain or loss on sales or exchanges in connection with certain liquidations
 "(a) General rule.—If—
 "(1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and
 "(2) within the 12-month period beginning on the date of the adoption of such

tributes its property pursuant to an approved plan for complete liquidation. In the opinion of the plaintiff, the transaction presently under consideration satisfies the criteria for nonrecognition and there is no reason to depart from such treatment. The development of the positions of the parties has given rise to what had seemed like an ancillary point but which, in fact, is basic to the entire problem. The plaintiff suggests that the reserve maintained by Berea was intended by the Congress to be wholly tax exempt. The Government says that if this is true, it is a complete answer to its position. Consequently, the resolution of that controversy is the starting point in deciding this case.

Prior to 1952, savings and loan associations were entirely exempt from income tax. The exemption was removed, and section 313(e) of the Revenue Act of 1951[2] amended section 23(k) (1) of the 1939 Internal Revenue Code.[3] It is the contention of the plaintiff that this legislation creates a partial exemption on earnings until a bank's surplus, undivided profits and reserves totals 12 percent of its deposits, the exemption being articulated in terms of an addition to bad debt reserve. The Government, on the other hand, believes that the reserve, measured as a percentage of deposits, is no different from any reserve for bad debts and should, therefore, be treated no differently.

Section 313 of the Revenue Act of 1951 was amended on the floor of the Senate to provide a minimum reserve for bad debts computed generally like the reserve ultimately authorized by section 23(k) (1) of the 1939 Code but utilizing a figure of 10 percent. Certain of the remarks made in the Senate debate are offered by the plaintiff in support of its "exemption" theory. We have perused the pertinent portions of the debate[4] and we are not persuaded that that discussion, considered in its entirety, supports the plaintiff's position. In reporting on the agreement of the conferees of both Houses on the 1951 Revenue Act, the Joint (Congressional) Committee on Internal Revenue Taxation staff summary said of section 313:[5]

"Section 313 of the bill removes the income tax exemption of savings and loan associations * * * but allows them to deduct dividends paid to depositors and the amounts placed in bad-debt reserves. The deduction for additions to bad-debt reserves is the same as that previously described in the case of mutual savings banks. Thus, the deduction may be a 'reasonable addition to reserve for bad debts' but in no case less than the institution deems

---

plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims, "then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period."

2. 65 Stat. 452,490.

3. Section 23(k) (1), Title 26 U.S.C. (1952 Ed.) provides, in pertinent part:
"* * * In the case of a mutual savings bank * * *, a domestic building and loan association, and a cooperative bank * * *, the reasonable addition to a reserve for bad debts shall be determined with due regard to the amount of the taxpayer's surplus or bad debt reserves existing at the close of December 31, 1951. In the case of a taxpayer described in the preceding sentence, the reasonable addition to a reserve for bad debts for any taxable year shall in no case be less than the amount determined by the taxpayer as the reasonable addition for such year; except that the amount determined by the taxpayer under this sentence shall not be greater than the lesser of (A) the amount of its net income for the taxable year, computed without regard to this subsection, or (B) the amount by which 12 per centum of the total deposits or withdrawable accounts of its depositors at the close of such year exceeds the sum of its surplus, undivided profits, and reserves at the beginning of the taxable year."
Substantially the same provision appears in the 1954 Code at section 593, Title 26 U.S.C.

4. 97 Cong.Rec., Part 9 (1951).

5. 1951–2 Cum.Bull. 287,301.

necessary, until the reserves equal 12 percent of total deposits or share accounts."

The debates and reports incline us to the belief that the Congress was thinking in terms of a bad debt reserve rather than an exemption.

But the plaintiff, in furtherance of its argument states, regardless of the reference to "bad debts" in section 23(k) of the 1939 Code and section 593 of the 1954 Code and its own characterization of the reserve as a "bad debt reserve," that the reserve is unlike an ordinary bad debt reserve principally because it is keyed to deposits rather than to debts and does not bear a relationship to loss experience. The defendant suggests, however, that a reserve against long-term loans based on loss experience might well not be sufficient to protect against the loss of customers deposits, the working capital of savings and loan institutions, in the event of a depression or sharp decline in the real estate market. That the Congress may have desired to see unusually large reserves created is not incompatible with the bad debt function of the reserves. The questions of the character of the reserve and the Congressional intent in authorizing it were recently considered by the Tax Court in Arcadia Savings and Loan Association et al. v. Commissioner, 34 T.C. 679, pending on appeal, 9th Cir. Speaking of the petitioner's deduction from income credited to the reserve, the court said, at page 682:

"* * * It was obviously allowed as an addition to a reserve for bad debts. The language of the provision clearly indicates this and there is no reason to depart from that conclusion because of anything that was said by members of Congress in the discussion leading up to the enactment of the provision. Congress was obviously generous in allowing the deduction. This might have been because of its desire to protect the solvency of building and loan associations and provide them with sufficient reserves to withstand possible adverse economic conditions. Nevertheless, the provisions which it made were for a reasonable addition to a reserve for bad debts. * * *"

Similarly, the plaintiff's argument that because the Congress required that reserves be built up to five percent of deposits, as prescribed in the National Housing Act,[6] it could not have intended reserves measured by 12 percent of deposits to be bad debt reserves must be rejected. Nothing in that provision of the Housing Act suggests that the five percent reserve is other than a minimum figure and, thus, not inconsistent with the 12 percent figure. Moreover, nothing in the provision requires that it be applied to every savings and loan association. Furthermore, we do not think that isolated provisions in the banking laws provide authoritative interpretations for the Internal Revenue Code.

■ We conclude, therefore, that the Congress, having removed the blanket tax exemption of savings and loan associations, did not intend to exempt the amounts accrued in reserves but rather that it intended to create liberal reserves against the possibility of unrealized loan receivables. Consequently, in proceeding to the issue of recognition on liquidation we will consider the reserve to be a bad debt reserve.

The provision for nonrecognition of gain on the sale of assets by a liquidating corporation was introduced into the 1954 Code [7] to avoid taxation of both the corporation and the stockholder on the same transaction. The problem of whether the sale had been made by the corporation before liquidation or the stockholders after liquidation had resulted in doubt and confusion in this area.[8]

6. Title 12 U.S.C.A. § 1726(b).

7. Title 26 U.S.C. § 337.

8. Compare Commissioner v. Court Holding Co., 1944, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 and United States v. Cumberland Public Service Co., 1950, 338 U.S. 451, 70 S.Ct. 280, 94 L.Ed. 251.

Mertens, The Law of Federal Income Taxation, Code Commentary, Sec. 337. As we noted at the outset the plaintiff contends that it was a sale within the meaning of this section which gave rise to the item on which the Commissioner based his deficiency determination and, hence, taxation of that amount as income was erroneous.

The reserve method of protection against bad debts which the plaintiff chose under the authorization of section 23(k) (1) of the 1939 Code and section 593 of the 1954 Code is an alternative to deductions at the time bad debts occur. When an uncollectible debt on which a deduction from gross income has been taken is subsequently collected, the amount so collected is treated as income in the year when received. S. Rossin & Sons, Inc. v. Commissioner, 2 Cir., 1940, 113 F.2d 652; Putnam National Bank v. Commissioner, 5 Cir., 1931, 50 F.2d 158. The Tax Court has consistently held that any balance in a reserve for bad debts is similarly to be restored to income in the year in which the need for it ceases. Arcadia Savings & Loan Association et al. v. Commissioner, supra; West Seattle National Bank of Seattle v. Commissioner, 33 T.C. 341, affirmed 9 Cir., 1961, 288 F.2d 47; Geyer, Cornell & Newell, Inc. v. Commissioner, 1946, 6 T.C. 96. In both the Arcadia and West Seattle cases the claim of nonrecognition of gain relative to the bad debt reserve of a liquidated savings and loan association was rejected. And in Arcadia also the court expressed the belief that a bank's bad debt reserve should be treated no differently from any other bad debt reserve.

Indeed, all of the important arguments made by the plaintiff in this suit were considered either by the Tax Court or the Court of Appeals in West Seattle and were rejected. This plaintiff maintains that any economic benefit it has received is derived from the sale of its assets placing the transaction within the realm of section 337. Concerning this point the Tax Court said in the West Seattle opinion:

"But this section affords relief only from a double tax on the gain from a sale of assets. The income here sought to be taxed did not arise from the sale of assets. The only relation the sale of petitioner's assets had to this income is that it removed the necessity for maintaining the reserve for bad debts because petitioner no longer held receivables, the full collection of which might be doubtful."

This is not a case of the appreciation of an asset realized at the time of sale. Rather the sale of the asset has freed a particular charge against capital which, having been derived from income, must be returned to income. Such a determination does not do violence to the meaning or purpose of section 337.[9]

The Court of Appeals in West Seattle considered the contention now being made here, viz., that sections 1011 and 1016(a) of the 1954 Code [10] require that in determining the existence of gain the basis of the asset must be adjusted by the amount of the reserve since it is a capital asset. It cited its own opinion in National Bank of Commerce of Seattle v. Commissioner, 1940, 115 F.2d 875, commenting [288 F.2d 49]:

"There it was said that to the extent of deductions taken, a debt loses its nature as capital and takes on the character of the untaxed income which the deduction represents. * * *"

In other words, the court assumed without deciding that an adjusted basis was arrived at; nevertheless, it still held that gain of this sort must be recognized. The court went on to say:

"Nor does the fact that the bad debt reserve is generally regarded as a valuation reserve affect the result. While the book value estab-

---

9. See, Katcher, Liquidating Problems and Pitfalls, N.Y.U. 17th Inst. on Fed.Tax., 827 at 840 (1959).

10. Title 26 U.S.C. §§ 1011, 1016(a).

lished thereby has an accounting significance, it is still based upon an *expectation* that loss of value will occur and not upon the fact that such loss has already occurred. It is a prediction of value and not a statement of present fact. Recovery of a debt which has been written off is not then a realization of a gain in asset value. It simply demonstrates that the value prediction was faulty and did not conform to the fact.

"In this respect the bad debt reserve is quite different from the depreciation reserve. A depreciation or depletion reserve is founded not upon the expectation of loss but upon facts. It recognizes that through depletion, wear and tear or obsolescence, the asset has to a certain extent actually been used up and that what is recovered by sale is recovered only from the unused portion of the asset. * * * The adjustment reflects the extent to which the asset has actually been exhausted * * *. The question is whether a gain or loss has been realized on that which remains."

The last remarks are relevant to the instant case since the plaintiff seeks to analogize the depreciation reserve and the non-recognition of gain thereon to the bad debt reserve. We do not consider it necessary to comment further on the dissimilarity of theory and purpose underlying these two kinds of reserves.

Further, the plaintiff argues for non-recognition by pointing out that under sections 332(a) and 354(a) (1) of the 1954 Code [11] no gain is recognized on the liquidation of subsidiaries or on stock exchanges in corporate reorganizations. The short answer to this, we think, is to emphasize the clear distinction between a complete liquidation on the one hand and liquidation into a parent corporation and reorganization of a corporation's capital structure on the other. In the latter situations the holder of the asset

continues in existence, although in an altered form, and continues to experience the risk of bad debt loss. Thus, unlike the former situation where the corporation goes out of existence, the reserve does not lose its reason for existence and there is no reason not to accord non-recognition.

The foregoing discussion leads inevitably to the following conclusions on the two primary issues: Berea's "Federal Insurance Reserve" should be treated as a reserve for bad debts in considering the effect of the bank's liquidation, and the balance remaining in that reserve after sale of the asset it complements must be considered income which is not subject to the non-recognition provisions of sections 336 and 337. The Commissioner's treatment of the reserve as ordinary income, to the extent that the credits thereto had conferred a tax benefit, was also correct. The recovery of an obligation previously deducted from income as uncollectible is treated as ordinary income. Merchants Nat. Bank of Mobile v. Commissioner, 5 Cir., 1952, 199 F.2d 657, affirming 14 T.C. 1375. As to plaintiff's claim that any gain recognized must be capital gain we will treat a reserve balance for bad debts in the same manner as actual losses deducted, as we have throughout this opinion. The credits to the reserve over the years reduced ordinary income and it is only realistic to return the balance to income. This was the treatment accorded to the bad debt reserves which were restored to income rather than treated as gains in West Seattle and Arcadia, supra.

Finally, the contention that gain should be taxed at the rates applicable to the years when the additions to the reserve were made rather than those of the year of liquidation must be rejected. The tax benefit rule implicitly recognized in Dobson v. Commissioner, 1943, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248 finds legislative sanction in section 22(b) (12) of the 1939 Code and section 111 of the 1954 Code.[12] Those sections exclude

11. Title 26 U.S.C. §§ 332(a), 354(a) (1).

12. Title 26 U.S.C. § 22(b) (12) (1952 Ed.); Title 26 U.S.C. § 111.

from gross income only that amount of bad debt recovery the deductions or credits for which did not result in a reduction in tax when taken. Here, however, plaintiff's income was reduced to the extent of the additions to the reserve in the years taken. Perry v. United States, 1958, 160 F.Supp. 270, 142 Ct.Cl. 7 is distinguishable since the recovery in that case involved a previously taken charitable deduction and not the bad debt, prior tax, or delinquency amount specified in section 111.

Accordingly, the refund of income tax deficiency here sought by the plaintiff is denied. The petition will be dismissed.

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN and WHITAKER, Judges, concur.