CITIZENS' ACCEPTANCE CORPORATION, a dissolved corporation continued by statute for purposes of suit, Howard W. Hudson and Robert D. S. Mustard, Trustees of Citizens' Acceptance Corporation, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 3407.

United States District Court, D. Delaware.

Nov. 10, 1970.

As Amended Jan. 20, 1971.

Supplemental Opinion Jan. 21, 1971.

Karl Haller of Tunnell & Raysor, Georgetown, Del., for plaintiffs.

F. L. Peter Stone, U. S. Atty., Wilmington, Del., and Johnnie M. Walters, Asst. Atty. Gen., Donald R. Anderson and Stephen J. Csontos, Attys., Dept. of Justice, Washington, D. C., of counsel, for defendant.

## OPINION

LATCHUM, District Judge.

This is a civil action, brought by the trustees of a dissolved Delaware corporation for the refund of Federal income taxes in the sum of $27,583.81, paid by the taxpayer corporation for the fiscal year ended March 31, 1964, plus statutory interest thereon.

Jurisdiction exists by virtue of 28 U.S.C. § 1346(a) (1) and venue is proper under 28 U.S.C. § 1402. The case is now before the Court on cross Motions for Summary Judgment.

The relevant and undisputed facts may be summarized as follows: Citizens' Acceptance Corporation ("Citizens") conducted a general finance business from its home office in Georgetown, Delaware and from four branch offices located in Delaware and Maryland. (Stip. ¶ 2.) [1] Its business consisted principally of purchasing notes receivable and installment obligations evidenced or secured by contracts of conditional sale or chattel mortgages arising out of the sale of goods and services by retail dealers, of making direct loans, and of financing dealers' inventories on the security of trust receipts. (Stip. ¶ 2.) In 1964 Citizens was dissolved and the Court of Chancery of the State of Delaware appointed Howard W. Hudson and Robert D. S. Mustard as trustees for the benefit of the shareholders of the corporation to oversee the prosecution of this and other pending suits and to complete the winding up of the affairs of the corporation (Stip. ¶¶ 3–4.) All interest of Citizens in any right to the refund of income taxes was assigned to the two trustees. (Stip. ¶ 5.)

Citizens utilized the accrual method of accounting and the reserve method of accounting for bad debts. Its tax year ran from April 1 through March 31. (Stip. ¶ 6.) It is the treatment of the installment receivables and the bad debt reserve used in connection with the installment receivables that is the subject matter of concern in this case.

When installment receivables were acquired by Citizens the face amount of each obligation was entered upon the books and records as a debit to an asset account. This "face amount" included the principal to be repaid and also the total amount of all finance charges which

---

1. "Stip. ¶" refers to the numbered paragraphs of an extensive stipulation of facts entered into between the parties in this case.

would be earned when the obligation was entirely repaid. The amount of the unearned finance charges was credited to a liability account. As the unearned finance charges were earned, the "unearned finance charges" account was debited and the "finance charges earned" account, an income account, was credited. (Stip. ¶ 7.)

To account for bad debt losses with respect to the financial paper owned by it, at the end of each tax year, Citizens would credit a "reserve for bad debts", a contra-asset account, with the amount of estimated bad debt losses, determined on the basis of experience. A corresponding debit would be made to a "bad debt expense" account. The amount debited to the "bad debt expense" account was, of course, deducted for Federal income tax purposes. When a receivable became worthless it was charged off against the reserve by debiting the bad debt reserve and crediting the appropriate receivable account.[2] (Stip. ¶ 8.)

Liquidation of Citizens was begun. On November 1, 1963, pursuant to a contract of July 25, 1963, the assets of Citizens were sold to the Wilmington Trust Company. (Stip. ¶¶ 15–17.) The "face amount" of installment receivables on the books of Citizens as of October 31, 1963 was $5,078,284.00.[3] Included in this figure were unearned finance charges amounting to $700,610.00. Consequently, the tax basis[4] or adjusted face value[5] of the installment receivables was $4,377,674.00 ($5,078,284.00 less $700,610.00). (Stip. ¶ 21.) At this time the balance in the bad debt reserve of Citizens was $164,311.00 (Stip. ¶ 20.)

Wilmington Trust Company paid a total consideration of $4,648,523.00 for the installment receivables and unearned interest. Of the $700,610.00 unearned interest, $370,383.00 was paid to Citizens, apparently on the grounds that it had accrued and had thus been "earned" by Citizens before the sale,[6] and $330,227.00[7] was deducted by Wilmington Trust Company, apparently because it was "unearned" at the time of sale. Wilmington Trust also deducted $99,534.00 from the adjusted face value of the receivables for anticipated bad debt losses and paid Citizens $4,278,140.00 for the receivables. (See Exhibits E and F to Stip. ¶¶ 15–16.) This payment was $64,777.00

2. The stipulation is unclear as to whether the total amount in the receivable asset account, representing the bad debt, was all charged against the bad debt reserve or only that portion representing the principal. Technically, only the principal should have been charged off against the bad debt reserve; the accrued interest should have been offset by crediting the receivable asset account and debiting the unearned finance charges liability account. Nothing in the record indicates that anything other than proper accounting procedures were followed in this regard. In any event this has no bearing on the issue presently before the Court.

3. To simplify matters the cents figures will be rounded to the nearest dollar.

4. The parties have stipulated that $4,377,674.00 should be considered the tax basis. (Stip. ¶ 21.)

5. For the sake of clarity the term "adjusted face value" will be used in this opinion to refer to the face amount of the receivables less the unearned finance charges.

6. In Cardinal Finance Company, Inc., 22 TCM 90, TC Memo 1963–24 (1963) the Tax Court held that interest income accrued up to the time of liquidation of a finance company should be included in its income for the year of liquidation. Thus it appears that this sum was income to Citizens for their last tax year. In light of the stipulations in this case that Citizens' second claim for refund correctly reflected its taxable income for the years covered, except for the bad debt reserve claim at issue here and an unrelated dividend credit, previously settled, this Court does not have to inquire into the treatment of this item in the present case (See Stip. ¶ 14.)

7. The figure was calculated by means of a 4% Add-on Weighted Average technique. In light of the stipulations of the parties the correctness of this method of calculating the figures will be assumed by the Court. No exception to this was taken by the Internal Revenue Service. (See Exhibits E and F to Stip. ¶¶ 15–16.)

above the net value of the installment receivables, $4,213,363.00, calculated as the adjusted face value less the bad debt reserve ($4,377,674.00 less $164,311.00). It was also, of course, $99,534.00 less than the adjusted face value. When Wilmington Trust Company entered the receivables on its books, it set up a bad debt reserve of $99,534.00 as its contra-asset account. (Stip. ¶ 22.)

On June 2, 1964, Citizens filed its Federal income tax return for the tax year ending March 31, 1964 with the District Director of Internal Revenue in Wilmington. (Stip. ¶ 9.) Citizens complied with the conditions specified in Section 337 of the Internal Revenue Code of 1954, 26 U.S.C. § 337, and consequently, paid no Federal income tax on the gain resulting from the sale of its assets to the Wilmington Trust Company.[8] (Stip. ¶ 18.) The transaction was reported by Citizens on its income tax return for informational purposes. The entire balance of the bad debt reserve, $164,311.00, was reported as income. (Stip. ¶ 20.)

On March 3, 1967 Citizens filed for a refund, claiming that $99,534.00, estimated by Wilmington Trust as the bad debt losses it would have to absorb from the receivables purchased, should have been charged against Citizens' bad debt reserve and not treated as a reduction in the selling price of the receivables. (See Exhibit C to Stip. ¶ 11.) Notice of the full disallowance was issued by the District Director of the Internal Revenue Service on September 20, 1967 and this suit timely followed. (Stip. ¶¶ 12–13.) In this suit Citizens abandoned the theory on which its original refund claim was based.

In this suit Citizens advanced a new theory and now claims that what occurred is that $99,534.00 of its bad debt reserve was "transferred" or "carried over" to Wilmington Trust Company when it sold its installment receivables. Consequently only $64,777.00 of Citizens bad debt reserve not "carried over" by Wilmington Trust should have been included in the corporation's income for the year.[9] Citizens thus contends that $99,534.00 of the $164,311.00 bad debt reserve should not be held to constitute income to the corporation.

The government contends, however, that because the total sale price paid for the receivables asset account was more than the tax basis (adjusted face value) of the receivables, there was a "recovery" of the entire bad debt reserve, including the $99,534.00 portion, rather than a "transfer." Hence the government argues that the entire amount of the bad debt reserve was correctly included in income by Citizens and no refund should be awarded.

Citizens bases its claim that the bad debt reserve is "transferred" upon the recently decided United States Supreme Court case of Nash v. United States, 398 U.S. 1, 90 S.Ct. 1550, 26 L.Ed.2d 1 (1970). In Nash the taxpayers, who had been operating eight partnerships, organized eight corporations and transferred, intact, the assets of the partnerships to the newly formed corporations in exchange for shares of the corporations' stock. The Commissioner of Internal Revenue determined that the partnerships should have included in income the amounts of the bad debt reserves applicable to the accounts receivable transferred. The Supreme Court disagreed and in Nash reversed the Fifth Circuit Court of Appeals, which had upheld the Commissioner's practice of requiring a bad debt reserve to be taken into income whenever the accounts receivable for which the bad debt reserve was a contra-asset account were sold or

8. Section 337 provides that when a corporation liquidates within a year in accordance with a proper plan of liquidation "no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period." 26 U.S.C. § 337. Section 337 enables any gain or loss to be taxable only to the shareholders thus avoiding double taxation.

9. Both parties agree that this $64,777.00 was properly included in Citizens' income for the year.

transferred. In *Nash* the Supreme Court held that in a tax-free transfer under Section 351 of the Code, 26 U.S.C. § 351,[10] where all that was received for accounts receivable was the net value of the receivables, i. e. the face value less the amount of the bad debt reserve, no "recovery" of the tax benefit of the reserve had occurred and consequently the amount of the reserve did not have to be taken into income by the transferor.[11]

The Supreme Court in *Nash* specifically approved the holding of the Ninth Circuit Court of Appeals in Estate of Schmidt v. Commissioner, 355 F.2d 111 (C.A.9, 1966). In *Schmidt* the Court held that in a Section 351 transfer no income was received by the taxpayer transferor unless the consideration received for accounts receivable exceeded the net value of the receivables, i. e. the face value less the amount of the bad debt reserve. The Court said, "we think that, whether the sale be for cash or stock, no income is received, unless the consideration received exceeds the net amount of the receivables. * * * We think that where accounts receivable are sold for cash for less than face value, the difference being the amount of the reserve, the taxpayer does not then 'realize' a loss." 355 F.2d at 114.

Section 351 provides for nonrecognition of gain or loss when assets are transferred to a corporation in exchange for stock while Section 337 provides for the nonrecognition of gain or loss when a corporation sells or exchanges its assets pursuant to a proper plan of liquidation. These two sections of the Internal Revenue Code were enacted for the purpose of shifting the burden of tax liability on two fairly common types of business transactions. Both the tax-

payer and the government admit that the same analysis used in *Nash* and the same concepts and principles apply to both sections. Courts have consistently cited decisions based upon either section in cases involving one or the other of these two sections. For example, the Tax Court in Max Schuster, 50 TC 98 (1968), a case involving Section 351 cited its decision in J. E. Hawes Corp., 44 TC 705 (1965), a case involving Section 337. And in Estate of Schmidt, 42 TC 1130 (1964), reversed 355 F.2d 111 (C.A.9, 1966) the Tax Court rested its decision that a bad debt reserve should be restored to a transferor's income after a Section 351 transaction on the Ninth Circuit's decision in West Seattle National Bank of Seattle v. Commissioner, 288 F.2d 47 (C.A.9, 1961), a case deciding the same issue under Section 337. See also Bird Management, Inc., 48 TC 586 (1967), a Section 337 case where the Ninth Circuit's *Schmidt* decision was distinguished without mentioning any distinction between Section 337 and Section 351.

The Court of Claims in Citizens Federal Savings & Loan Association of Cleveland v. United States, 290 F.2d 932, 154 Ct.Cl. 305 (1961) in dicta recognized a distinction between a corporate reorganization under Sections 332 and 354 and a liquidation under Section 337. This dicta was accepted by the Court in Home Savings and Loan Association v. United States, 223 F.Supp. 134 (S.D. Calif.1963) in holding that in a Section 332 transaction a reserve for bad debts of a subsidiary merged with a parent corporation need not be restored to income in the subsidiary's final tax return. The Tax Court in its decision in the *Estate of Schmidt* case, supra, considered the dicta in the *Citizens Federal* case to

10. Section 351 provides, in part, "No gain or loss shall be recognized if property is transferred to a corporation * * * by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control * * * of the corporation." 26 U.S.C. § 351. Section 351 is chiefly concerned

with the situation in which a sole proprietorship or partnership incorporates and continues the same business with the only change being one of form.

11. Thus this issue is now settled as to Section 351. See Rowe v. United States, 428 F.2d 874 (C.A.6, 1970); Israel J. Erlich, 54 T.C. 1231 (1970).

see whether it required a distinction to be drawn between transactions under Section 337 and transactions under Section 351. The Tax Court rejected this dicta as completely erroneous and unsupported by any statutory provision.[12]

■ From the standpoint of policy it would seem that the same reasons which compelled the Supreme Court's holding in *Nash* would apply to a Section 337 transaction. The underlying purpose of both sections is to avoid inequitable double taxation. Since the Supreme Court in *Nash* held that a transfer of receivables for their net value produced no "recovery" of the related bad debt reserve, it is difficult to understand why there would be a "recovery" in a similar transfer under Section 337 simply because the transferee business is not owned by the same persons as the transferor business. This view is further strengthened in the present case by the government's concession in its brief that the rationale of *Nash* applies to Section 337 transactions. Thus, this Court holds that in the treatment of a bad debt reserve the same principles applicable to a transaction under Section 351 are applicable to a transaction under Section 337. In so holding this Court joins the Tax Court in rejecting any implication to the contrary contained in the dicta of *Citizens Federal*.[13]

While the *Nash* and *Schmidt* cases only involved transactions in which there was a transfer of receivables at their net value (the face value less the amount of the bad debt reserve), no logical reason has been advanced why their application would be limited only to transactions involving transfers at exactly net value. The dicta in *Schmidt*, quoted supra, indicates that the Ninth Circuit did not intend to limit its decision to just the situation involving the sale at net value. It would be absurd to argue that if in *Nash* the transferee corporation had determined that the amount of the transferor's bad debt reserve should be reduced by one dollar, the *entire* bad debt reserve should have been included in the transferor's income. This Court therefore holds that the rationale of *Nash* applies to transactions in which receivables are sold at more than their net value.

In its brief the government explains its view as to how the rationale of *Nash* and *Schmidt* apply to a case such as this one as follows:

"According to *Nash* and *Schmidt* 'recovery' means receipt of consideration in excess of the net value of the receivables. Thus, if a business has $1,000,000 in receivables with a reserve for bad debts of $50,000, sale of the receivables for $950,000 will result in no recovery of the reserve; sale for $975,000 would result in a recovery of one-half of the reserve; and sale for $1,000,000 or more would result in full recovery of the reserve."

This Court agrees with the government's interpretation of *Nash*. Accordingly, the Court will adopt this method of calculating the proper amount of Citizens' bad debt reserve which must be taken into its income.

■ Applying this method to the facts stipulated in the present case, the net value of the receivables was $4,213,363.00 ($4,377,674.00, the adjusted face value less $164,311.00, the amount of the bad debt reserve), $4,278,140.00 was paid by Wilmington Trust as consideration for the receivables themselves (the total receivables less the unearned interest[14]) and the difference is $64,777.00. Therefore, the amount of the bad debt reserve

---

12. See also Argus, Inc., 45 TC 63, 70–71 (1965). In First National State Bank of New Jersey, 51 TC 419 (1968), another pre-*Nash* case, the Tax Court relied on cases involving Section 337 to hold that a bad·debt reserve should be included in a transferor's income after a Section 332 transaction. No distinction between the two sections was drawn.

13. Cf. Arent, "Reallocation of Income and Expenses in Connection with Formation and Liquidation of Corporations, 40 Taxes 995, 1002 (1962).

14. See footnote 6, supra.

which was "recovered" by Citizens and which should have been included in its income for the year of liquidation was $64,-777.00. Hence, Citizens was correct in its claim that only $64,777.00 was properly included in its income for the year rather than the whole sum of $164,311.-00.

The Court is not unmindful of a long and almost unbroken line of pre-*Nash* decisions contrary to this conclusion., Many cases have held in the past that when a corporation is liquidated pursuant to Section 337 the total amount of any bad debt reserve is income to the corporation in the year of liquidation. See West Seattle National Bank of Seattle v. Commissioner, 288 F.2d 47 (C.A. 9, 1961); Citizens Federal Savings & Loan Association of Cleveland v. United States, 290 F.2d 932, 154 Ct.Cl. 305 (1961); Arcadia Savings & Loan Association v. Commissioner of Internal Revenue, 300 F.2d 247 (C.A.9, 1962); Ira Handelman, 36 TC 560 (1961); C. Standlee Martin, Inc. v. Riddell, 56–2 USTC ¶ 9989, 51 A.F.T.R. 1376 (S.D.Calif. 1956); Cardinal Finance Company, Inc., 22 TCM 90, TC Memo 1963–24 (1963); J. E. Hawes Corp., 44 TC 705 (1965); Bird Management, Inc., 48 TC 586 (1967); John T. Dodson, 52 TC 544 (1969). Nor is this Court unmindful that the Commissioner of Internal Revenue, prior to *Nash*, had adopted the same view in Revenue Ruling 57–482.

However, this Court is of the opinion that the United States Supreme Court's decision in *Nash* has, in effect, overruled these cases as to their holdings concerning the treatment of bad debt reserves in a Section 337 liquidation. Therefore, this Court is convinced they no longer represent controlling authority on this point. Likewise the Court is of the opinion that Revenue Ruling 57–482, as a result of *Nash*, no longer reflects the proper interpretation of the law.

In the only prior case tending to take a different view from the pre-*Nash* cases cited above, Mountain States Mixed Feed Company v. United States, 245 F.Supp. 369 (D.Colo.1965), aff'd. on other grounds 365 F.2d 244 (C.A.10, 1966), the Court held that where accounts receivable were sold for less than their face value the "loss" could be charged against the bad debt reserve. Regardless of whether or not that case was decided correctly at the time, this Court is of the opinion that the rationale of that case has been superseded by the rationale of *Nash*. The result of *Mountain States Feed* might be obtained today by the application of *Nash*, although this Court notes that in that case an addition to the bad debt reserve, increasing it to equal the "loss" incurred, was made in the year of liquidation. The Court expresses no opinion on the propriety of that apparent meshing together of the rationale of Fribourg Navigation Co. v. Commissioner of Internal Revenue, 383 U.S. 272, 86 S.Ct. 862, 15 L.Ed.2d 751 (1966) with the rationale of Calavo, Inc. v. Commissioner of Internal Revenue, 304 F.2d 650 (C.A.9, 1962). In reaching its conclusion in the present case this Court has found it unnecessary to place any reliance on *Mountain States Feed*.

For the reasons herein set forth the plaintiffs' motion for summary judgment will be granted and the defendant's motion for summary judgment will be denied.

Submit final judgment for refund allowance in accordance with this opinion.

### SUPPLEMENTAL OPINION

On November 30, 1970 a final judgment, approved as to form by the parties, in the amount of $27,583.81 was entered in plaintiffs' favor. On December 9, 1970 the government filed a "motion for reconsideration" purportedly made pursuant to Rules 52 and 59,[15] F.R.Civ.P.

---

15. Such a motion is generally considered to be a motion to alter or amend a judgment pursuant to Rule 59(e) though some authority exists for considering the mo-

tion as one under Rule 59(a)2. See Woodham v. American Cystoscope Co., 335 F.2d 551, 555 (C.A.5, 1964).

A memorandum of law in support of this motion has been filed. Affidavits and an answering memorandum were submitted by the plaintiffs.

Since this case was initially determined upon cross motions for summary judgment upon facts stipulated to by the parties, no independent findings of fact were made by the Court and consequently Rule 52, F.R.Civ.P., is inapplicable. The motion therefore will be treated as a motion for reargument under Rule 59.[16]

The present motion is based upon the following language contained in the Court's November 10, 1970 opinion: "Of the $700,610.00 unearned interest, $370,383.00 was paid to Citizens, *apparently on the grounds that it had accrued and had thus been 'earned' by Citizens* before the sale * * *." (Emphasis added) The government contends that by so stating the Court, in effect, made a finding, independent of the stipulated facts, that the $370,383.00 was earned by Citizens and thus should have been included in the corporation's income for the year of liquidation, in accordance with the authority cited in footnote 6 of the Court's opinion. The Court disagrees.

It is apparent from the Court's language that no finding of fact as to this aspect of the transaction was made. The passage quoted, especially the language emphasized, clearly shows that the Court was neither stating the matter as being true nor making a finding that it was true. In this sentence and in the accompanying footnote the Court used the terms, "apparently" and "it appears". At no time did the Court make a finding as to the actual reason why Citizens

received $370,383.00 of the $700,610.00 unearned interest. The Court did not intend for its comments to constitute a finding of fact with respect to this aspect of the transaction and the comments should not be so construed.

■ The second reason for denying the government's motion is that the "fact" allegedly "found" by the Court was completely irrelevant to the decision reached. The single issue presented to the Court was whether the bad debt reserve of Citizens should have been included in its income for its last year. The government's present contention that Citizens was liable for income taxes in the year of liquidation on that portion of the unearned interest paid to it was not raised by any pleadings, stipulations, or motions and was not before the Court for consideration. Whether the interest should have been included in Citizens' income had no bearing on the proper disposition of the sole issue decided, the inclusion into income of Citizens' bad debt reserve. Even if this Court were to agree with the government's contention that Citizens' portion of the unearned interest should have been included in its income, the original decision in this case would in no way be affected. All the facts relevant to the Court's decision on the single issue litigated were contained in the stipulation of undisputed facts.[17] Thus the government's claim that the decision was based upon facts not shown in the record is totally without merit.

For the reasons herein stated, the government's motion for reconsideration or reargument will be denied.

An order will be entered in accordance with this supplemental opinion.

16. The motion was not filed as a motion for reargument pursuant to Local Rule 16, 4 Fed.R.Serv.2d 1112, 1117. Such a motion must be made within five days after the filing of the Court's opinion. The present motion was filed almost one month after the date the opinion was announced. However, the Third Circuit Court of Appeals has held that Rule 59 is broad enough to allow a motion for reargument regardless of local court rules. Gainey v. Brotherhood of Railway &

Steamship Clerks, 303 F.2d 716, 718 (C.A.3, 1962). The present motion has tolled the time limit for taking an appeal. Sonnenblick-Goldman Corp. v. Nowalk, 420 F.2d 858, 859 (C.A.3, 1970).

17. The government agreed to the stipulation of fact. It is well established that the government is bound by stipulations of fact entered into by it. United States v. Kahriger, 210 F.2d 565, 571 (C.A.3, 1954); Missouri-Illinois R. Co. v. United States, 381 F.2d 1001, 1003 (Ct.Cl.1967).